THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MICHAEL JAMESON, Defendant-Appellant.

First District (1st Division)   No. 85—1429

Opinion filed April 13, 1987.

Steven Clark and Gordon H. Berry, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, James E. Fitzgerald, and Patricia Shea Wilson, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

Following a bench trial, defendant, Michael Jameson, was convicted of the offenses of rape, deviate sexual assault, home invasion, and residential burglary (Ill. Rev. Stat. 1983, ch. 38, pars. 11—1(a), 11—3(a), 12—11, 19—3, respectively) and sentenced to concurrent prison terms of 20 years for each of the first three offenses and 15 years for residential burglary. On appeal, defendant contends that: (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the trial court erred in denying his pretrial motion to have the alleged victim examined by a psychiatrist; (3) the trial court erred in allowing testimony as to defendant's appearance at the time of his arrest; and (4) the trial court erred in denying defendant's post-trial motion and in not appointing new counsel to investigate the post-trial allegation predicated on ineffective assistance of counsel. For the following reasons, we find that the trial court erred in denying defendant's post-

trial motion without first appointing substitute counsel to argue his allegation predicated on ineffective assistance of counsel and, therefore, remand the cause for a new post-trial hearing where defendant will be represented by counsel other than the public defender's office. In reaching this determination, we decline to address the substantive aspects of defendant's post-trial motion. However, we do address defendant's remaining allegations of error and find them insufficient to grant him a new trial.

The record sets forth the following facts pertinent to this appeal. Prior to trial, defendant moved for an order directing the victim, L.R., to submit to a psychiatric examination to determine her competency to testify. Defendant predicated his motion on information in the police reports which allegedly indicated that L.R. had been under psychiatric care for five years and was currently under medication for schizophrenia. The trial court denied the motion and the cause was set for a bench trial.

Thereafter, on the day set for commencement of trial, defendant personally moved *instanter* for the court to appoint a bar association attorney to represent him rather than the public defender's office. Defendant alleged that his current counsel refused his calls, never came to see him, and had neglected to contact key witnesses. Immediately following defendant's motion, the defense counsel moved to withdraw as defendant's attorney, stating that due to the numerous complaints defendant had filed against her, she believed that it would be a "conflict of interest" for her to continue as his counsel. The State responded that defendant's motion was untimely and that defense counsel had been doing a competent job. The trial court denied defendant's motion on the ground that it was: (1) untimely; (2) the motion gave no valid reason for an appointment of a bar association attorney; and (3) in the court's view, the motion was merely a delaying tactic. The court then also denied defense counsel's motion to withdraw.

At trial, L.R. and defendant presented conflicting testimony as to the events of February 2, 1984. L.R. testified that approximately 3 p.m. on that day, she was standing in the lobby of her apartment building on Winthrop in Chicago, talking on the telephone, when she saw defendant enter the building with a young woman. L.R. had never seen defendant before, but recognized the woman as the daughter of one of the building's tenants. When L.R. finished her telephone call, she walked up the stairs to her third-floor apartment, where she lived alone.

Immediately upon entering the apartment, L.R. latched the front

door chain latch and went into the bathroom to use the toilet. While she was sitting on the toilet, she heard a loud kick at her front door, then heard the chain latch fall to the floor. From where she was sitting in the bathroom she could see the front door. Defendant walked into the apartment, approached L.R. in the bathroom, and ordered her to keep her pants down and to lie down on the floor. L.R. described her assailant as a 30-year-old black male, 6 feet tall, real husky, missing some front teeth, beard, mustache, track marks on his arms, bald spot, medium afro hairstyle, and wearing a black leather jacket, gray sweatshirt, gray pants, and black shoes.

When L.R. began to cry, defendant started to choke her. She then lay down on the floor and defendant removed his pants and had vaginal intercourse with her. Defendant then ordered L.R. to go into the bedroom and to lie down on the bed. When he lay down next to her, she began to cry again and asked him not to hurt her baby. L.R. was five months pregnant at the time. Defendant then forced L.R. to engage in acts of oral sex, vaginal intercourse, and anal intercourse. Finally, L.R. told defendant that she had a doctor's appointment that she had to keep. The two then got dressed and defendant told L.R. where he could get some food.

Defendant and L.R. left the apartment building together and walked several blocks to the Jewel grocery store. The only people they saw on their way to the store were a group of men in front of the apartment building who knew defendant and had asked him if he was going to work. L.R. stated that she accompanied defendant to the store because she had been scared. Defendant was unarmed.

At the Jewel, while L.R. waited for him at the front of the store, defendant walked toward the back of the store and picked up some food and put it inside his shirt. After a few minutes, two security guards approached her and told her to leave because defendant had been caught stealing. L.R. started to cry, wondering how she was going to explain all of this to her doctor. The security guards did not press charges and defendant and L.R. left the Jewel. L.R. claims that she and defendant exited the store separately and that she did not see where he went.

As soon as L.R. left the Jewel, she walked to a nearby public telephone and called her psychiatrist, Dr. Spivy. She told Dr. Spivy that she had just been raped and needed to talk to him. He told her to come over immediately, which she did. After speaking with the doctor for approximately 15 minutes, L.R. went to a nearby hospital for a physical examination, and, while there, she spoke to police officers for the first time. Following her examination, L.R. went to a girl friend's

house, where, upon looking in a mirror, she noticed six 2-inch-long marks on the front of her throat.

On February 4, 1984, L.R. spotted defendant talking with some other males near her apartment building. She immediately dialed 911 and told the dispatcher that she had just seen the man who had raped her. Two police cars arrived and defendant was arrested upon being identified by L.R.

On cross-examination, when L.R. testified that she had no pets, the State reminded her of her previous deposition in which she had stated that she first became aware of defendant's presence in her apartment when her cat started to meow. In addition, L.R. admitted that when she spoke to the police officers at the hospital, she had failed to mention that she and defendant had gone to the Jewel together after the alleged rape. She claimed that she had been too afraid to tell them. It was not until several days after defendant's arrest, when the police asked L.R. about going to the Jewel with defendant, that she admitted that she had. L.R. never reported the broken chain latch to the building manager. Instead, she asked a friend, Terrance McClay, to fix it.

In contradiction to L.R.'s version of the events of February 2, 1984, defendant testified that he had known L.R. for "quite some years" from the Uptown area. On the afternoon of the alleged offense, defendant entered L.R.'s apartment building with a friend and noticed L.R. talking on the telephone in the lobby of the building. He told his friend to go upstairs and he walked over to L.R. When he saw her "condition," he gave her $20. She then hung up the telephone and the two of them took the elevator to her apartment. Inside the apartment, L.R. immediately walked to the bedroom, took off her clothes, and sat down on the bed. When defendant saw that she was pregnant, he told her to put on her clothes. He commented to her that she was in terrible shape and told her to walk to the Jewel with him and they would use the $20 to buy some food. Defendant had approximately $700 in cash on him that day. They then left the apartment. Defendant denied having threatened L.R. or having had sexual intercourse with her.

When L.R. and defendant arrived at the Jewel, he walked to the meat department and L.R. waited for him at the exit. A security guard spoke to L.R. while defendant was attempting to steal some meat and told the two of them to leave. Both L.R. and defendant left the Jewel together and walked to the end of the parking lot. She then went in one direction; he went in another.

On cross-examination, defendant stated that he had last seen L.R.

in July 1983 when she attempted to have him arrested for taking money from her. Defendant admitted that his original intention when he saw L.R. was to have sexual intercourse with her. However, when he saw that she was pregnant, he decided against it.

Terrance McClay, L.R.'s friend, testified that on January 31, 1984, he had purchased a chain latch for L.R.'s apartment door and had attached it. On February 3, 1984, the chain latch was broken and he put a few holes in the door and reattached it. On cross-examination, McClay became confused about the dates and stated that the chain had been broken on January 2.

John Vaughn, security guard at the Jewel, testified that approximately 4 p.m. on February 2, 1984, he saw L.R. and defendant walking across the Jewel parking lot together. He recognized L.R. from previous visits to the store, but had never seen defendant. When the two entered the store, defendant walked toward the meat case in back of the store and L.R. waited by the exit door. Vaughn observed defendant take some chickens, put them under his coat, and then stand in a checkout line. Vaughn then identified himself to L.R., asked her why she and her friend liked to shoplift, and told her that next time they would be arrested. He then approached defendant, told him to put the chicken on the counter and leave the store. Vaughn saw L.R. and defendant leave the Jewel together. Two days later, the police contacted Vaughn about the incident.

On cross-examination, Vaughn stated that L.R. started to cry when he approached her, but that she did not say anything to him. Further, he did not see any scratches on her neck.

The State then stipulated that if Dr. Ron Lee, a physician in the emergency room at Illinois Masonic Hospital, testified, he would state that on February 2, 1984, approximately 5:20 p.m., he examined L.R. and observed bruises and scratches in the anterior neck area as well as tenderness in the area of both inner and upper thighs. The State further stipulated that if Dr. Spivy, L.R.'s psychiatrist, testified, he would state that on February 2, 1984, approximately 4 p.m., L.R. called him and told him that she had been raped. She arrived at his office between 4:30 p.m. and 5 p.m. They spent 15 to 20 minutes talking and then he sent L.R. to the emergency room at Illinois Masonic Hospital to be examined. It was also stipulated that if Michael Zefeld, a microanalyst for the Chicago police department, testified, he would state that he had conducted tests on the specimens taken from L.R. and had found no presence of spermatozoa or semen.

On rebuttal, R. M. Stevens, Chicago police officer, testified that when he arrested defendant on the afternoon of February 4, 1984, he

was unshaven, emitted a strong body odor, and was wearing soiled and stained clothing.

Following closing arguments, the court found defendant guilty of rape, deviate sexual assault, home invasion, residential burglary, and unlawful restraint. The court further found that the unlawful-restraint conviction merged with the rape conviction. In reaching its decision, the court stated that: (1) L.R. had been a fair witness on her own behalf; (2) L.R.'s case had been "damaged" by the events which took place after the rape and by the defense's impeachment of her testimony regarding the cat's meowing; (3) Terrance McClay was believable; (4) John Vaughn had been a good witness and the fact that L.R. had not told him that she had just been raped could "probably" be explained by the fact that she was under psychiatric care; (5) defendant had been a terrible witness, demonstrating a "poor demeanor" and giving unbelievable testimony; and (6) Dr. Lee's stipulation corroborated L.R.'s testimony.

Thereafter, defendant's motion in arrest of judgment and for a new trial was denied and, following a hearing in aggravation and mitigation, defendant was sentenced to concurrent prison terms of 22 years for rape, deviate sexual assault, and home invasion, and 15 years for residential burglary. Defendant's timely appeal followed.

Defendant first contends that the State failed to prove him guilty beyond a reasonable doubt of home invasion, burglary, rape, and deviate sexual assault where the victim was suffering from schizophrenia, made a trip to the supermarket with defendant immediately after the incident, was impeached, and gave incredible testimony.

■■■ Although it is the duty of a reviewing court to carefully examine the evidence in a case alleging sexual offenses, the court must not usurp the function of the trier of fact to weigh the credibility of the witnesses and to evaluate the evidence presented as a whole. (*People v. Slavin* (1978), 66 Ill. App. 3d 525, 531-32, 383 N.E.2d 1303.) The trial court's finding will not be reversed unless the evidence is palpably contrary to the finding or so unsatisfactory and unconvincing that it raises a serious doubt as to defendant's guilt. (*People v. Szudy* (1982), 108 Ill. App. 3d 599, 605, 439 N.E.2d 137.) Further, if a rape victim's testimony is clear and convincing, detailed, certain, and free from doubt, it is sufficient to support a finding of guilty. (*People v. Patterson* (1980), 90 Ill. App. 3d 775, 780, 413 N.E.2d 1371; *People v. Potts* (1966), 74 Ill. App. 2d 301, 307, 220 N.E.2d 251.) In the event the victim's testimony is not clear and convincing, there must be corroborating evidence. *People v. Anderson* (1974), 20 Ill. App. 3d 840, 841, 314 N.E.2d 651.

■ In the present case, defendant specifically alleges that L.R.'s testimony is unreliable on several grounds: (1) she suffered from schizophrenia, a disease which distorts reality; (2) her testimony was riddled with inconsistencies; (3) she had failed to tell either the men outside her building or the security guard at the Jewel about the rape; and (4) she was extremely defensive about the repair of her apartment door. With respect to defendant's allegation that L.R. suffered from schizophrenia, our review of the record reveals no medical evidence of that condition. Instead, defendant's page references to the record in support of his allegation refer to his own motion for a psychiatric examination of L.R., with no accompanying medical affidavits; to L.R.'s testimony, which does not mention any mental illness; and to defense counsel's statement to the court that the police reports indicated L.R. was under medication for schizophrenia. In our judgment, defendant's undocumented allegation regarding L.R.'s mental condition is unpersuasive and fails to undermine the reliability of L.R.'s testimony.

With respect to L.R.'s alleged inconsistent statements, defendant specifically points to the facts that: (1) L.R. failed to tell the detective at the hospital that she had walked to the Jewel with defendant, and, instead, told him that when defendant stopped to talk to his friends outside the apartment building, she ran away; (2) L.R. told the detective that defendant had committed six sexual acts on her, while at trial, she testified that it had been four; and (3) at the preliminary hearing, L.R. stated that she had become aware of defendant's presence in her apartment when her cat meowed, and at trial, she stated that she had never owned a pet.

■ While we agree that L.R.'s failure to tell the detective about the Jewel is puzzling, we do not find that it casts a serious doubt on L.R.'s credibility or on defendant's guilt in light of all the facts. L.R. stated that she had been scared while at the hospital and thus told the detective she had run away while in front of the building. Considering the traumatic events that had just transpired, the fact that she was under psychiatric care, and the fact that, when in a more composed state, she gave a recitation of the events which were corroborated by Vaughn's testimony, we do not find this discrepancy warrants reversal. Regarding the actual number of sexual acts and her statement about the cat, in our view, these constitute minor discrepancies which neither render the testimony unconvincing (*People v. Szudy* (1982), 108 Ill. App. 3d 599, 605, 439 N.E.2d 137) nor warrant reversal (*People v. Thomas* (1979), 72 Ill. App. 3d 186, 196-97, 389 N.E.2d 1330). Moreover, any variances go to the issue of credibility, which, as previ-

ously stated, is a determination to be made by the trier of fact. *People v. Hine* (1980), 88 Ill. App. 3d 671, 676, 410 N.E.2d 1017; *People v. Slavin* (1978), 66 Ill. App. 3d 525, 531-32, 383 N.E.2d 1303.

Defendant further argues that L.R.'s failure to tell either the males in front of the building or the security guard at the Jewel about the rape renders her testimony incredible and unreliable. In support of his position, defendant relies on *People v. Anderson* (1974), 20 Ill. App. 3d 840, 314 N.E.2d 651, and *People v. Rosario* (1982), 110 Ill. App. 3d 1020, 443 N.E.2d 273. We do not find these cases persuasive of defendant's position.

In *Anderson*, defendant was found guilty of rape, deviate sexual assault, and robbery. The victim testified that at approximately 5 p.m. in early October, she had been walking alone in the Old Town area of Chicago when defendant approached her from the rear, put his arm around her right shoulder, placed his left hand to her left side, and threatened to shoot her. It was daylight, there were many pedestrians around, and heavy traffic was moving in both directions on the street. When the victim attempted to scream, defendant put his hand over her mouth and forced her into the intersection, at one point even trying to push her into a car. Defendant and the victim continued to struggle as he forced her down the street and into the washroom of a building. Defendant then raped the victim several times and committed deviate sexual acts. At one point, defendant left the victim alone in the washroom, and returned with another man. Both men then raped her. The victim stated that she had not screamed for help while on the street because she was afraid of defendant's gun, although she never actually saw one. Further, she had not asked the man at the building entrance or another man she had seen in the building hallway for help because both seemed to know defendant. When defendant left the second time, the victim ran out of the building and told two policemen on the street what had happened. She did not tell her parents she had been raped until the next day. At trial, defendant claimed that the victim, who had been "high," approached him on the street and wanted to have sexual intercourse.

The *Anderson* court found that the victim's testimony was not clear and convincing because: (1) there was no evidence to support her statement that the men in the building appeared to be friends of defendant; (2) the victim failed to escape when defendant apparently left the premises the first time; and (3) there was no corroborating evidence.

In contrast to *Anderson*, in the present case, L.R. stated that she had not sought help or attempted to escape prior to her telephone call

to her doctor because she had been frightened. The trial court found her testimony credible and further found that there was sufficient corroborating evidence. We do not find its determination so contrary to the evidence as to warrant reversal.

In *People v. Rosario* (1982), 110 Ill. App. 3d 1020, 443 N.E.2d 273, this court reversed a rape conviction, noting that there had been no threats of physical violence, no outcries by the victim, and no attempt to escape when a reasonable opportunity to do so presented itself. In *Rosario*, the victim and defendant had previously dated. She voluntarily entered his car and he drove to a parking lot where he allegedly raped her. After the act of sexual intercourse, defendant left the car to purchase two bottles of pop while the victim remained in the car. She made no attempt to leave or to cry out. Later, on the drive home to her house, they stopped for gas. Again, the victim made no attempt to cry out. When they arrived at the victim's house, defendant walked her to the door. Later, the victim told her brother-in-law, with whom she lived, that she had been raped.

The facts in our case are clearly distinguishable from those in *Rosario*. Defendant and L.R. did not have a previous intimate relationship and L.R. did not voluntarily admit defendant to her apartment. Further, as soon as L.R. felt she was talking to someone she could trust, she told him she had been raped. In *Rosario*, defendant walked the victim to her door where her family lived and she made no outcry.

Finally, defendant alleges that L.R.'s "defensiveness" regarding a picture of her apartment door shown to her at trial and her secretive attitude concerning her relationship with Terrance McClay render her testimony unreliable. We disagree and find the evidence sufficient to support the trial court's determination regarding L.R.'s credibility. Based upon the entire record, we cannot say that the evidence fails to prove defendant guilty beyond a reasonable doubt.

■ Next, defendant argues that the trial court erred in denying his pretrial motion to have L.R., who allegedly suffered from schizophrenia, examined by a court-appointed psychiatrist. Prior to trial, defendant moved for a psychiatric examination of L.R. to determine her competency to testify. The court denied the motion on two grounds: (1) section 115—7.1 of the Code of Criminal Procedure (Ill. Rev. Stat. 1985, ch. 38, par. 115—7.1) prohibits the court from ordering a victim of an alleged sex offense to submit to a psychiatric or psychological examination, and (2) the motion was too vague and not supported by an affidavit showing the need for an examination. The court noted that even if the form of the motion had been proper, section 115—7.1 would have precluded an order for psychiatric examina-

tion.

On appeal, defendant contends that section 115—7.1 is unconstitutional because it violates his rights to due process and equal protection of the laws and violates the doctrine of separation of powers. Further, defendant argues that the fact his motion failed to state a compelling reason for a psychiatric examination is not a bar to his claim of reversible error because any amendment to the motion would have been futile in light of the court's decision that section 115—7.1 precluded such an examination.

In our judgment, defendant's failure to raise the constitutionality of section 115—7.1 as an issue in the trial court constitutes a waiver of his right to raise the issue on appeal. (*People v. McKiness* (1982), 105 Ill. App. 3d 92, 433 N.E.2d 1146.) Accordingly, we decline to address this issue and concur with the trial court that section 115—7.1 barred it from ordering L.R. to submit to a psychiatric examination. Our determination based on statutory law obviates the need to discuss defendant's argument as to the necessity at common law to set forth a compelling reason for the examination.

■ Next, defendant contends that the trial court erred in admitting the rebuttal testimony of the arresting officer who stated that when defendant was arrested he was unshaven, smelled terrible, and was wearing dirty, second-hand clothing. Defendant claims that the arresting officer's testimony regarding his appearance was "an extreme case of collateral impeachment, of speculative probative value," and that it prejudiced defendant. The court allowed the testimony as rebuttal to defendant's earlier statement that on the day he was with L.R. he had had $600 to $700 in cash in his pocket.

Generally, rebuttal evidence is limited to that which answers, explains, repels, contradicts, or disposes of new affirmative matter raised by defendant. The decision to permit rebuttal testimony rests largely in the discretion of the trial court and will not be reversed on appeal unless that discretion is abused and the defendant is prejudiced. (*People v. Thornton* (1977), 54 Ill. App. 3d 202, 207, 369 N.E.2d 358.) In our view, defendant's reliance on *People v. Wilson* (1948), 400 Ill. 603, 81 N.E.2d 445, in support of his claim that the testimony was improperly admitted is misplaced. In *Wilson*, the testimony was found to be inadmissible on the ground that it was too remote in time to be relevant to the crime charged. That situation is not present in our facts.

■ Although it is questionable in our minds as to whether the fact defendant was in a slovenly condition when arrested acts to contradict his testimony that he had had $600 to $700 in cash two days

earlier, defendant has failed to offer any evidence as to how he was prejudiced by the arresting officer's testimony. Accordingly, we find that even if the officer's testimony was improperly admitted, it was harmless error and does not provide grounds for reversal.

■ Finally, defendant argues that the trial court erred in failing to question defense counsel as to defendant's post-trial claims of ineffective assistance of counsel and in failing to appoint new counsel to investigate these claims.

The relevant facts concerning defendant's claim of ineffective assistance of counsel commence with the first day of trial when defendant personally presented to the court his motion for a bar association attorney. As grounds for his motion, defendant argued that: (1) he had not been able to get in touch with the public defender, and (2) the public defender had made no effort to contact two Chicago police officers whose testimony would impeach L.R.'s statement that she did not know defendant. In response to defendant's motion, the public defender moved to withdraw as defendant's attorney, stating that defendant had commenced complaints about her representation three months earlier in letters written to the legal aid clinic as well as to the public defender's office. Further, he had recently written complaint letters to the United States Attorney General and to the Attorney Registration and Disciplinary Commission. Although the public defender denied having acted incompetently in her representation of defendant, she felt it would constitute "a conflict of interest" for her to continue representing defendant. The trial court denied both motions, finding that defendant's motion was untimely and that it gave no valid reason for the appointment of a bar association attorney. The court further assured defendant that "if [the police officer] is living [the public defender] will get him down here."

Following trial, the same public defender moved for a new trial, alleging, *inter alia*, that the court erred in denying defendant's motion to replace her as defendant's trial counsel prior to the commencement of trial. Defense counsel did not argue the motion nor did defendant request to argue it *pro se*. The trial court denied the motion. Following arguments in aggravation and mitigation, defendant addressed the court on his own behalf, reminding the court of its promise to him that if the police officer were alive, he would be brought to court to testify. Defendant added that he had talked to the officer personally and learned that he had never even been subpoenaed.

We find *People v. Krankel* (1984), 102 Ill. 2d 181, 464 N.E.2d 1045, dispositive of the issue. In *Krankel*, following a jury trial,

defendant was convicted of burglary. Defense counsel filed a motion for new trial and three weeks later defendant filed a *pro se* motion for new trial, alleging ineffective assistance of counsel predicated on defense counsel's failure to present a valid alibi defense. The trial court allowed defendant to argue his *pro se* motion. Defense counsel moved for a continuance as to his motion, stating that defendant should be assigned new counsel for the post-trial hearing. The trial court denied the motion for continuance and denied the post-trial motions. On appeal, the reviewing court reversed and remanded for a new trial, holding that the trial court had erred in denying defendant's motion for new trial when counsel had failed to investigate an alibi witness.

The State appealed to the supreme court, alleging that the appellate court had erred in finding that defendant had established ineffective assistance of counsel. The supreme court declined to address the substantive issue of ineffective assistance of counsel and found that defendant should have had new counsel to represent him on that issue at the post-trial hearing. Accordingly, the *Krankel* court vacated the judgment of the appellate court and remanded the cause for a new hearing on the defendant's assertion of ineffective assistance of counsel. Accord, *People v. Simpson* (1984), 129 Ill. App. 3d 822, 473 N.E.2d 350.

Although the facts in the present case differ from those in *Krankel*, we find that the effect of both factual situations on the fundamental fairness of the post-trial proceeding is the same and demands the same result. In our case, prior to trial, defendant requested new counsel on the grounds that his counsel never met with him and failed to take any steps to investigate defendant's claim that certain Chicago police officers would testify that L.R. and defendant knew each other prior to the alleged incident. We find it noteworthy that defense counsel acknowledged the rift in cooperation by filing a motion to withdraw as counsel. In addition, after denying both motions, the trial court assured defendant that the police officer would be there to testify. However, the officer never testified and the record does not indicate the reason for his absence. In our view, this information should have been presented at the post-trial motion hearing.

Further, although defendant did not explicitly allege ineffective assistance of counsel in his post-trial motion, it is clear that that allegation was the basis for his pretrial motion for new trial, the denial of which was raised as error in the post-trial motion. Based upon defendant's pretrial efforts to obtain new counsel and defense counsel's concomitant agreement to withdraw, we find it was inappropriate for the

original trial counsel to argue a motion which was predicated on allegations of her own incompetence. Moreover, in light of the unique circumstances of this case, we do not find that defendant's failure either to argue the post-trial motion *pro se* or to request substitute counsel at the post-trial hearing precludes him from a new post-trial hearing with representation by substitute counsel.

In finding *Krankel* dispositive, we find *People v. Mallette* (1985), 131 Ill. App. 3d 67, 475 N.E.2d 237, which declined to follow *Krankel*, distinguishable from our case. In *Mallette*, defense counsel argued nine points of a post-trial motion and defendant argued the tenth point, which alleged ineffective assistance of counsel, predicated on defendant's belief that his counsel had not been adequately prepared. Defense counsel had denied the allegation when originally made prior to commencement of trial. While we concur with the *Mallette* court's statement that *Krankel* does not mandate appointment of new counsel every time a defendant presents a post-trial argument of ineffective assistance of counsel, we find that the ultimate focus of inquiry must be on the underlying conduct alleged to have prejudiced defendant. In *Mallette*, the underlying conduct was defendant's speculation that his counsel was not adequately prepared. In our case, the underlying conduct is defense counsel's failure to make any effort to contact a possible key witness.

Accordingly, we remand this matter for a new post-trial hearing on defendant's allegation of error in the denial of his motion for new counsel, with appointed counsel other than the public defender's office. If the trial court determines upon rehearing that denial of defendant's motion to replace his trial counsel constituted reversible error, the defendant should be granted a new trial. If, however, the trial court determines that there was no error, it should deny a new trial and leave standing defendant's convictions and sentences for rape, deviate sexual assault, home invasion, and residential burglary.

For the aforementioned reasons, the cause is remanded for a new post-trial hearing on defendant's allegation of error in the denial of his motion for new counsel.

Remanded for new post-trial hearing.

QUINLAN, P.J., and BUCKLEY, J., concur.