**UNITED STATES of America, ex rel. Ellis O. PARTEE, Petitioner–Appellee,**

v.

**Michael P. LANE and James H. Thieret, Respondents–Appellants.**

No. 90–1302.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 21, 1990.

Decided March 8, 1991.

John L. Conlon, Nancy Ellen Zusman, Kathleen Burch, Hopkins & Sutter, Chicago, Ill., Jean Hendren Ceddia, Riverwoods, Ill., David A. Upshaw, Indianapolis, Ind., for petitioner-appellee.

Mark L. Rotert, Asst. U.S. Atty., Neil F. Hartigan, Atty. Gen., Steven J. Zick, Crim. Appeals Div., Chicago, Ill., for respondents-appellants.

Before BAUER, Chief Judge, and POSNER and KANNE, Circuit Judges.

BAUER, Chief Judge.

In 1983, a DuPage County jury found Ellis Partee guilty of armed robbery. The trial court entered judgment on this conviction and sentenced Partee to 30 years of imprisonment. After pursuing appeals in the Illinois court system, Partee sought habeas corpus relief in the district court. Partee claimed, among other things, that his trial counsel's failure to subpoena an important alibi witness deprived him of his sixth amendment right to effective assistance of counsel. The district court agreed and granted Partee the writ. For the reasons discussed below, we reverse.

I

On September 19, 1982, an armed man wearing eyeglasses robbed a gas station in Darien, Illinois. When the station was free of customers, the man emerged from his hiding place in the garage area of the station and surprised Cary Kos, the sole attendant on duty. He ordered Kos to empty the cash box into a briefcase he was carry-

ing. The man then pulled out a gun, grabbed Kos, and ordered him to unlock the back office of the station, but Kos did not have the key. The man then fled the station, making off with $300 to $400 dollars. About one month later, Ellis Partee was pulled over for a traffic violation. Partee had in his possession glasses and a briefcase similar to the ones described by Kos as belonging to the robber, so the police seized these items and took Partee's picture for a photographic lineup. The police then brought in Kos, who identified Partee's briefcase and glasses as being similar to the robber's. Kos then was shown an array of five photographs, and he picked out Partee as the man who robbed the station.[1] Partee was charged with armed robbery, and an assistant public defender was appointed to represent him.

Partee's defense from the outset was that, at the time of the robbery, he was visiting his friend Zernalia Keesee in Joliet, Illinois. The record reveals that Partee's counsel from the public defender's office had some difficulty locating Keesee to substantiate the alibi. After getting at least one trial continuance on account of this difficulty, the assistant public defender ultimately found Keesee and subpoenaed her.[2] Thereafter, but prior to his trial, Partee dismissed his appointed counsel and retained Steven Decker, a private attorney, to represent him.

Partee's trial before Judge Bruce R. Fawell of the Circuit Court of DuPage County began on May 9, 1983, and lasted four days. The State introduced evidence of Kos' out-of-court photo identification of Partee, and Kos made an in-court identification of Partee as the robber. Kos stumbled a bit, however; his descriptions of the physical appearance of the robber wavered, both during his trial testimony and in various statements to the police before trial.

Decker, Partee's trial counsel, exploited the inconsistencies in Kos' statements. He grilled Kos during cross-examination, and highlighted Kos' waffling in arguments to the court in opposition to the admission of the briefcase, glasses and other State's evidence, and in arguments in support of an unsuccessful motion for judgment of acquittal at the close of the State's case.

In his defense case, Decker presented four witnesses to support Partee's alibi. Partee himself then took the stand. He testified that, on the date of the robbery, he went to Keesee's home in Joliet at about noon and remained there until 4:45 or 5:00pm (the robbery at the gas station in Darien took place at approximately 4:40pm). After leaving Keesee's home, he drove to another friend's home in Joliet, and then on to the home of Donald and Marilee Torrence. He estimated that he arrived at the Torrences' home, which was also in Joliet, between 5:15 and 5:30pm. Both of the Torrences, and the two additional alibi witnesses who were at the Torrences' home that evening, all testified that Partee arrived at the Torrences' at about 5:30pm. Decker also put on evidence that the drive time from the gas station in Darien to the Torrences' home in Joliet was such that Partee could not have robbed the station at 4:40pm and made it to the Torrences' by 5:30pm.

Missing from the list of alibi witnesses was Keesee. Just before Partee was to take the stand, Decker informed the court that he was having trouble locating Keesee. He represented to the court that he had had three telephone conversations with Keesee in the preceding four days, including one the previous afternoon, "instructing" her to come to court:

> I informed her that the Torrences would come by and pick her up in the morning.

---

**1.** The same photo lineup also was shown to Janet Tunget, who, from across several lanes of traffic, had seen the robber flee the gas station. Tunget was unable to identify anyone from the photos, but she did identify Partee's briefcase as similar to the one carried by the robber.

**2.** On appeal, counsel for Partee argues that Keesee never was subpoenaed in this case at any

time, inviting us to overturn as clearly erroneous the district court's finding that the public defender's office did in fact serve Keesee with a subpoena. Because the record adequately supports the district court's finding on this matter (see our factual discussion below), we decline that invitation.

She said "fine." She had conversations with Mary Torrence yesterday, confirming she would be picked up at 8:30 in the morning. She was not at the location where she said she would be. We have made attempts to contact her at the only number I have for her, as well as the only number that she ever gave the State's Attorney's investigator, which was her place of business. All we can get there today is an answering machine. We have left an innumerable number of messages on that. I sent the Torrences out to Joliet to try and find her. We didn't even know where her exact current residence is, just her work address. I don't know if she's at work.

Transcript of Proceedings Before Judge Fawell ("Trial Tr."), May 11, 1983, at 481–82. Decker then suggested to the court (this all took place outside of the presence of the jury) that he could proceed with Partee and his other witness, the State could proceed with any rebuttal, and then the trial could be continued to the following morning when Keesee would testify—assuming she would show. The court asked Decker if he had a subpoena out on Keesee, and Decker responded, "I sent people out today./ THE COURT: She's not been served with a subpoena?/ MR. DECKER: No." *Id.* at 483. The court then reserved ruling on the matter, adding, "I am inclined to feel if she's only cumulative, and she hasn't been served with a subpoena, I hate to delay the trial an extra day or half a day...." *Id.*

So the trial proceeded, and Decker put on Partee and his last defense witness. After the questioning of these two had ended, the court conducted another sidebar as to how to proceed in the absence of Keesee. Decker again recounted his conversations with Keesee, his attempts to get her to appear that morning, and the missed ride with the Torrences. When asked again by the court whether a subpoena had been served on Keesee, Decker replied that, although he did not subpoena her for that day, he believed that Keesee was subpoenaed by Partee's previous counsel, the public defender's office. He professed that he did not know whether that subpoena had been

"continued in force." After admonishing Decker to do everything in his power to locate Keesee, the court granted Decker's request to end for the day. The court told Decker he could conditionally rest his defense case and reopen the following morning with Keesee's testimony, if she appeared. *Id.* at 1188–93.

Partee's case was called the next morning, and still no Keesee. Decker explained to the court that he had sent an investigator to Keesee's purported place of employment with subpoena in hand, but Keesee was nowhere to be found. She apparently had been fired, and her former employer had no idea where she lived or where she might be working. Because he had not yet been able to "physically see or reach" Keesee, Decker asked the court for a postponement of "at least one hour." Trial Tr., May 12, 1983, at 566–68. Partee himself then addressed the court. He stated that he had spoken with Keesee's mother that morning, and she did not know Keesee's whereabouts, either. "It's just like she just disappeared," said Partee. *Id.* at 568–69. The prosecutor then spoke in opposition to the request for another continuance. He argued that waiting until mid-trial to try to serve a subpoena was too late. Decker responded that he believed a subpoena first had been served on Keesee by the public defender's office, but that it was canceled when the first trial date was moved. The court commented that subpoenas normally are continued, not canceled, when trials are postponed. The prosecutor added that he remembered that all orders continuing Partee's trial dates also continued all subpoenas. (The record bears out that recollection.)

Having heard enough, the trial judge ruled on the motion for another continuance:

I think I have given sufficient time for the witness to be brought in. She could have been subpoenaed a long time ago, and I think there has been enough time given. I think maybe the diligence hasn't been as it should be. I would agree with [the prosecutor]. I would deny the motion.

*Id.* at 571. But Decker persisted. He offered to bring in his investigator, Keesee's former employer, and others to verify the efforts he had made to locate the elusive Keesee. The court took Decker at his word as to his efforts to serve Keesee with a subpoena, but nonetheless stood firm in its denial of the continuance. *Id.* at 571–74.

The trial proceeded to final arguments. In his argument, the prosecutor commented upon the absence of Keesee, stating that there had been "not one scrap of evidence in this case to corroborate the fact that [Partee] was at the residence of Zernalia Keesee ... [or] to even corroborate the fact [that] there is such a person. Does she exist?" *Id.* at 595. In his closing argument, Decker again stressed the inconsistencies in Kos' description of the robber and the robbery, claiming that Kos engaged in largescale "rationalizing." That afternoon, the jury returned with a verdict of guilty of armed robbery.

The trial court held a hearing one month later, at which the court entertained Partee's post-trial motions. In arguing for a new trial, Decker presented a laundry list of "reversible errors" that had occurred at Partee's trial, including the court's refusal to grant a continuance to allow more time to find Keesee. Unlike at trial, Keesee actually was present at this hearing. Decker offered to have Keesee tell the court what her testimony would have been. Decker also represented that he had a copy of a subpoena made out to Keesee, and that he wished to have her testify as to her receipt of the subpoena. Trial Tr., June 27, 1983, at 8–9. Keesee was placed under oath and testified. Keesee verified that her testimony would have corroborated Partee's testimony concerning his visit to her home on the night of the robbery. Keesee also confirmed that Decker had spoken with her about coming to Partee's trial and that Decker had arranged transportation for her through the Torrences. Keesee explained that she had waited at the designated meeting place, but left when the ride was over fifteen minutes late. When asked by Decker whether she remembered receiving a subpoena, Keesee answered, "Well, not that I can recall. I don't stay in one place too much." *Id.* at 30. Keesee then testified in vague generalities about several conversations she had with individuals who were "supposed to be defending Ellis Partee." She didn't remember their names, but she did remember that she didn't appreciate being bothered with all of their questions. *Id.* at 30–35.

After receiving this testimony and further argument, the court denied Partee's motion for new trial. Partee immediately raised complaints concerning the adequacy of Decker's representation. Partee argued that he should be appointed new counsel and given another shot at post-trial motions. The primary error Partee charged in Decker's performance was Decker's failure to assure that Keesee showed up to testify at the trial; after all, Partee stated, his first counsel from the public defender's office had found Keesee (Partee stated that he saw a copy of the subpoena that had been sent to her), and Decker had Keesee's mother's address. Decker responded to the effect that he had done everything he could to locate Keesee, given that he never had Keesee's home address and that Keesee was "elusive, to say the best." *Id.* at 43–44. Astutely realizing that Partee and Decker had begun "beating a dead horse," *id.* at 45, the trial judge denied Partee's motion for new counsel for another round of post-trial arguments, and moved to sentencing. Because of Partee's lengthy criminal history, the court sentenced him to 30 years' imprisonment.

Partee brought both a direct appeal and a petition for post-conviction relief in the Illinois state courts, the latter under Ill. Rev.Stat.1983, ch. 38, para. 122–1 *et seq.* In both proceedings, Partee argued, among other things, that Decker's failure to subpoena Keesee denied him effective assistance of counsel. In Partee's direct appeal, the Illinois appellate court rejected this argument and, in an unpublished decision, affirmed Partee's conviction. Partee's petition for leave to appeal this decision to the Illinois Supreme Court was denied. Partee's pursuit of collateral relief met with a similar fate: after an evidentiary hearing

on March 29, 1985, the Illinois trial court found that Partee had failed to prove that Decker had not performed competently, and thus denied the petition. In another unpublished opinion, the appellate court affirmed.

■ His state remedies exhausted,[3] Partee petitioned the district court for habeas corpus relief pursuant to 28 U.S.C. § 2254. Partee's primary arguments were that his fourteenth amendment right to due process was violated because his conviction was based on an unreliable identification by Kos, and that his sixth amendment right to effective assistance of counsel was violated because Decker failed to subpoena Keesee. The district court's ruling on Partee's petition came in two stages. In the first stage, the court rejected Partee's due process challenge, finding that Kos' identification was sufficiently reliable under *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). *United States ex rel. Partee v. Lane*, No. 87 C 2814, slip op. at 21–25 (N.D.Ill. June 24, 1988) [available on WESTLAW at 1988 WL 71230]. In that same opinion, the district court posited that whether Partee's ineffective assistance claim had any potential merit depended upon whether Decker had continued Keesee's original trial subpoena. If he had, then Partee's ineffective assistance claim would be rejected; if not, further briefing would be ordered as to whether Decker's failure to continue the subpoena constituted ineffective assistance. The court gave the State two months to come forward with

evidence to show that the original subpoena had been continued.

The State failed to produce the requested documentation before the district court's deadline, so the court ordered further briefing. In an opinion dated January 22, 1990, ("stage two" of the district court's ruling), the court addressed Partee's ineffective assistance claim. The court took as granted that Decker had failed to subpoena Keesee,[4] and discussed and applied the standards for ineffective assistance claims established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), in light of that failure. The court concluded that Partee had met *Strickland*'s standards, and, therefore, granted the writ. *United States ex rel. Partee v. Lane*, No. 87 C 2814, slip op. (N.D.Ill. Jan. 22, 1990) [available on WESTLAW at 1990 WL 7151]. The State was granted a stay of this order, *United States ex rel. Partee v. Lane*, No. 87 C 2814, slip op. (N.D.Ill. Mar. 12, 1990) [available on WESTLAW at 1990 WL 37681], and brought a timely appeal.

## II

We note at the outset that Partee and the State disagree as to the binding effect of the findings and conclusions contained in the opinions of both the district court and the state courts. To summarize briefly, the State argues that the district court did not—and this court should—defer to the state courts' conclusion that Decker had given "reasonable, competent and profes-

---

3. We find that the exhaustion requirement embodied in 28 U.S.C. § 2254(b) and (c) is satisfied here, despite Partee's apparent failure to seek leave to appeal to the Illinois Supreme Court the appellate court's affirmance of the denial of his post-conviction petition. By presenting his ineffective assistance claim to the Illinois courts, including the Illinois Supreme Court, on direct appeal and then presenting the same claim again to the Illinois trial and appellate courts in his proceeding for collateral relief, Partee has fairly presented this claim to the Illinois state court system and has afforded it a fair opportunity to treat the merits of the claim, which is all that the exhaustion requirement demands. *See Brown v. Allen*, 344 U.S. 443, 447–50 & 448 n. 3, 73 S.Ct. 397, 402–03, & 403 n.3, 97 L.Ed. 469 (1953). *See also* L. Yackle, *Postconviction Remedies* § 64, at p. 274 (1981) ("[I]n cases in which

the issue *was* treated on direct review and a postconviction proceeding has *not* produced new facts that were unavailable to the appellate courts earlier, [an appeal from a lower state court's denial of collateral relief] is repetitious and need not be undertaken.") (emphasis in original).

4. The State points us to the trial court's continuance orders in an effort to prove to this court what it failed to prove to the district court; namely, that Keesee was in fact still under subpoena at the time of the trial. The State's effort is too little, too late. We will assume, as did the district court, that Decker failed to continue Keesee's original subpoena up through the ultimate trial, and that he failed to serve her with a new subpoena.

sional" assistance to Partee. In response, Partee argues that neither the district court nor this court need defer to those conclusions as to "mixed questions of law and fact," but that this court should defer to exactly one "finding of historical fact" made by the state courts: that Keesee was "never" subpoenaed.[5] Neither party has it quite right.

Section 2254(d) of Title 28 of the U.S.Code establishes a presumption of correctness that federal habeas courts are to apply to factual determinations made by state courts. The statute lists a number of situations in which this presumption is overcome, including when the federal court concludes that the state court's factual determination is "not fairly supported by the record." 28 U.S.C. § 2254(d)(8). *See generally Sumner v. Mata*, 455 U.S. 591, 597–98, 102 S.Ct. 1303, 1307, 71 L.Ed.2d 480 (1982). Two points must be made concerning this rebuttable presumption. First, before it can even arise, "the state court must have resolved the merits of a factual dispute. [28 U.S.C.] § 2254(d)(1). In essence, subsection 2254(d)(1) of the habeas statute merely codifies the self-evident proposition that a state court must have made a finding on a particular issue before a federal court can defer to that finding. *See Townsend v. Sain*, 372 U.S. 293, 313–14 [83 S.Ct. 745, 757, 9 L.Ed.2d 770] (1963)." *Andersen v. Thieret*, 903 F.2d 526, 529 (7th Cir.1990). This point disposes of Partee's argument that we are bound by the state courts' "finding of historical fact" that Keesee was never subpoenaed. The state courts made no such finding. In the record references pointed to by Partee as state court "findings," the state court was either accepting as true—as did the district court and this court—the fact that *Decker* did not subpoena Keesee, *see supra* at note 3 and accompanying text, or assuming that Keesee was not generally under subpoena in order to show that Partee's ineffective assistance claim was without merit in any event. The second point is· this: § 2254(d)(1)'s presumption of correctness

does not apply at all to the state courts' ultimate conclusion as to whether the petitioner's counsel rendered effective assistance, as that conclusion flows from the application of legal standards and constitutional principles to the facts. *See Strickland*, 466 U.S. at 698, 104 S.Ct. at 2070; *United States ex rel. Smith v. Lane*, 794 F.2d 287, 289 n. 3 (7th Cir.1986). *See also Sumner*, 455 U.S. at 597, 102 S.Ct. at 1306; *Cuyler v. Sullivan*, 446 U.S. 335, 341–42, 100 S.Ct. 1708, 1714, 64 L.Ed.2d 333 (1980). This point disposes of the State's suggestion that the district court should have deferred to the state courts' conclusion that Decker performed "competently." A federal district court reviewing a habeas petition must perform its own review as to whether the representation provided by petitioner's counsel was constitutionally adequate, and we must do the same. *See United States ex rel. Simmons v. Gramley*, 915 F.2d 1128, 1133 (7th Cir.1990).

That behind us, we move to the merits of Partee's claim. The task, of course, is to apply the familiar two-pronged *Strickland* standard to Partee's claim: Partee must establish both that Decker's performance was deficient, meaning it fell below the legal profession's objective standards for reasonably effective representation, and that this deficiency prejudiced his defense, meaning that "there is a reasonable probability that, but for [Decker's] unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687–88, 691–94, 104 S.Ct. at 2064, 2066–68. We examine the first, performance prong through a highly deferential lens, indulging "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. at 2065. *See also United States v. Madewell*, 917 F.2d 301, 304 (7th Cir.1990); *United States ex rel. McCall v. O'Grady*, 908 F.2d 170, 173 (7th Cir.1990). We are similarly circumspect in examining the second, prejudice prong, employing a "strong presump-

---

**5.** This is the foundation for Partee's suggestion that we overturn as clearly erroneous the district court's finding that Keesee had been sub- poenaed by Partee's first counsel; a suggestion we reject *supra* at note 2.

tion of reliability" of the original verdict. *Strickland,* 466 U.S. at 696, 104 S.Ct. at 2069. *See also McCall,* 908 F.2d at 173. The ultimate benchmark of the inquiry is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland,* 466 U.S. at 686, 104 S.Ct. at 2064.

■ The application of these principles to Partee's claim is complicated by the fact that error is claimed in Decker's failure to bring testimony before the trial court. As we explained in *McCall,* a habeas court cannot even begin to apply *Strickland's* standards to such a claim unless and until the petitioner makes a "specific, affirmative showing as to what the missing evidence or testimony would have been." 908 F.2d at 173. Without such a showing, it is very difficult to assess whether counsel's performance was deficient, and nearly impossible to determine whether the petitioner was prejudiced by any deficiencies in counsel's performance. The petitioner must come forward with "sufficiently precise information" as to the evidence or testimony that was not brought before the trial court:

> The focus of the inquiry must be on what information would have been obtained from [the missing witness' testimony] and whether such information, assuming its admissibility in court, would have produced a different result. Under usual circumstances, we would expect that such information would be presented to the habeas court through the testimony of the potential witnesses.... [I]f the potential witnesses are not called [before the district court], it is incumbent on the petitioner to explain their absence and to demonstrate, with some precision, the content of the testimony they would have given at trial.

*United States ex rel. Cross v. DeRobertis,* 811 F.2d 1008, 1016 (7th Cir.1987) (footnote omitted).

In the instant case, the district court did not hold an evidentiary hearing to take testimony from Keesee and/or Decker, but relied instead upon the state court record.

In contrast, most successful "missing witness"-type of ineffective assistance claims have been supported by testimony, in the district court, from the missing witness(es) and trial counsel. *See McCall,* 908 F.2d at 174–75 (collecting cases). Indeed, in *McCall* itself, we reversed the grant of the habeas writ and remanded the case because, in the absence of an evidentiary hearing in the district court at which such testimony could be elicited, the petitioner had not yet made the required showing. *See id.* at 175–76. Unlike in *McCall,* we conclude that the petitioner in this case has made the "sufficiently precise" showing required by *Cross* absent testimony before the district court. The reason for the difference is that, in this case, the record already contains the content of the testimony the missing witness would have given at trial—Keesee's sworn testimony at the post-trial hearing on June 27, 1983—as well as reliable, specific information as to the reasons for trial counsel's failure to produce the missing witness—Decker's representations to the court during trial and his sworn testimony at the hearing on Partee's post-conviction petition in state court. This testimony allowed the district court, and allows this court, to review both the cause and effect of Decker's failure to produce Keesee. *Cf. Kubat v. Thieret,* 867 F.2d 351, 360–63 (7th Cir.1989) (state record included sworn testimony from post-conviction hearing of alibi witnesses not called at habeas petitioner's trial); *Montgomery v. Petersen,* 846 F.2d 407, 409 (7th Cir.1988) (state record included sworn testimony from a different proceeding of key alibi witness not called at habeas petitioner's trial).

■ After conducting our own review of the record, we conclude that Partee cannot meet his burdens under *Strickland.* The duty to afford reasonably effective representation to a criminal defendant has many facets. Defense counsel must do his utmost to bring his legal acumen to bear on behalf of the defendant; keep the defendant fully informed of developments in the case and consult with the defendant on all major decisions to be made; conduct a rea-

sonable pre-trial investigation, which should include contacting potential witnesses; prepare adequately and professionally for trial; conduct the trial to the best of his ability; and, at bottom, serve as a vigorous and devoted advocate of the defendant's cause. *See generally* American Bar Association Standards Relating to the Administration of Criminal Justice, §§ 4–1.1 to 4–8.6 ("The Defense Function") (2d ed. 1980). *See also Strickland,* 466 U.S. at 687–91, 104 S.Ct. at 2064–67. But must trial counsel ensure that every important defense witness has transportation to the courthouse? No case cited by Partee, nor any case that we could find, has held defense counsel to such a duty. Further, without such a duty, Partee's claim of ineffective assistance is doomed, as Decker's failed attempt to get Keesee to court forms the nub of Partee's offering on the performance prong.

The public defender's office, Partee's first counsel, began the investigation and development of Partee's alibi defense case. In so doing, they contacted and ultimately subpoenaed Keesee. After taking over the case, Decker, too, investigated Partee's alibi defense case and contacted Keesee. Decker relied upon Partee's promise that Keesee was willing to testify, as well as upon the limited information Partee supplied concerning Keesee's whereabouts. In addition, Decker had his own telephone conversations with Keesee, wherein they reviewed the content of Keesee's testimony. Keesee assured Decker that she would appear and testify. But we know what happened then: the ride Decker arranged for Keesee on the morning of her appearance was late getting to the rendezvous point, and the whole thing fell through. Keesee could not be found; to use Partee's own representation to the trial court, she "just disappeared." What followed was a frantic effort by Decker to find Keesee and/or get additional time from the court to do so. Decker's efforts to get Keesee's testimony before the court, hamstrung from the beginning by Keesee's elusiveness and her self-admitted tendency not to "stay in one place too much," ultimately failed. Decker managed nonetheless to put

on a substantial alibi case in Partee's defense, and vigorously to exploit potential weaknesses in the State's case. In assessing Decker's efforts, we must do our best to eliminate the "distorting effects of hindsight," and we must look at his *overall* performance. *Kimmelman v. Morrison,* 477 U.S. 365, 386, 106 S.Ct. 2574, 2588, 91 L.Ed.2d 305 (1986); *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065; *Harris v. Reed,* 894 F.2d 871, 877 (7th Cir.1990) ("In the context of ineffective assistance claims, appellate judges—who are often drawn from the trial bar and who are generally expected to be omniscient in all other respects—must quell the tendency to [play 'Monday morning quarterback' and] call the plays they think should have been called."). Employing these principles, we fail to see how Decker's performance can be deemed professionally incompetent.

Partee argues, and the district court held, that Decker, knowing how important Keesee's testimony was and how uncooperative and elusive she had been, had a duty to subpoena her. It was in failing to discharge this specific duty, the argument goes, that Decker rendered ineffective assistance. (Put to one side the point that it is within the purview of allowable strategy for trial counsel to chose *not* to subpoena a witness who is friendly, or reluctant, or would otherwise react negatively to being "ordered" to appear. *Kubat,* 867 F.2d at 361.) If Keesee was in fact as uncooperative as this argument suggests, would serving her with another subpoena have guaranteed that she would have waited those fifteen extra minutes for her ride to show up? Or, more generally, that she would have appeared at all? Partee's arguments, and our review of the record, raise at most a muffled "maybe." Because by this argument Partee intends to carry his burden under *Strickland* of establishing that, but for Decker's failure to subpoena Keesee, the result of the trial would have been different, nothing less than a resounding "yes" will do.

### III

No doubt, the performance of Partee's trial counsel was not perfect. In the rush

of preparing Partee's alibi case for trial, Partee's counsel could have served another subpoena on Keesee (for whatever good it might have done), and could as well have personally made sure that Keesee got herself to the courthouse. Neither of these "failures," however, viewed independently or in combination, constitute deficient performance; nor do they undermine our confidence in the outcome. Thus, the assistance afforded by Partee's counsel was not constitutionally ineffective, and Partee's habeas petition must be DENIED. Accordingly, the judgment of the district court is REVERSED.