Ralph S. **HOCKETT, II**, Petitioner–
Appellant,

v.

**Jack R. DUCKWORTH and Indiana
Attorney General,** Respondents–
Appellees.

No. 91–3139.

United States Court of Appeals,
Seventh Circuit.

Argued April 28, 1992.

Decided July 26, 1993.

Rick C. Gikas (argued), Kopack & Gikas, Merrillville, IN, for petitioner-appellant.

David A. Nowak (argued), Michael A. Schoening, Deputy Attys. Gen., Linley E. Pearson, Atty. Gen., Office of Attorney Gen., Federal Litigation, Indianapolis, IN, for respondents-appellees.

Before COFFEY and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

COFFEY, Circuit Judge.

Ralph Hockett, II appeals the district court's denial of his *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his Indiana state court convictions for murder, burglary, robbery and arson. Hockett argues that the district court erred in dismissing his habeas petition without holding an evidentiary hearing to explore his claim that his attorneys rendered ineffective assistance of counsel. We affirm.

## I.  BACKGROUND

### A.  Facts

On May 12, 1980, Clyde T. Meyers was murdered, robbed and his house set on fire. Meyers died from trauma caused as a result of being struck in the head and torso with a blunt instrument and stabbed in the back with a sharp object. Sgt. Rodney Jones of the Indiana Sheriff's Department investigated the murder and concluded that Meyers' walking crutch was the blunt instrument used to inflict the fatal injuries. Robert Brunner, a witness to the fire at Meyers' house, advised Sgt. Jones and his investigating officers that he observed a gold Chrysler automobile leaving the driveway of Meyers' home shortly before the fire started and later identified Hockett as the driver of the Chrysler. Martha Matthews, a neighbor of Meyers', saw Hockett and a gold Chrysler motor vehicle in the vicinity of Meyers' house about forty-five minutes before the fire started.

Suspecting Hockett was involved in the Meyers murder, Sgt. Jones and several other sheriff's department officers arrested Hockett at his home on several outstanding traffic warrants. After he was arrested and taken into custody, Hockett signed a waiver of rights and made a statement to the police admitting he was in Meyers' residence when one or more of Meyers' assailants used Meyers' crutch to murder him. Hockett also during the questioning admitted having in his possession two of the victim's hurricane lamps, as well as an owl figurine, and two television sets of Meyers'. Based on Hockett's statement, Sgt. Jones procured a search warrant for Hockett's residence. During the execution of the search warrant, Jones discovered two television sets, two hurricane lamps and an owl figurine in Hockett's residence that Ivan Meyers (Meyers' brother)

and Linda Bee (Meyers' granddaughter) identified as belonging to Meyers. In oral argument, Hockett's counsel conceded that there were "blood stains on ... items [of personal property] stolen" from Meyers found in the police search of Hockett's home. When asked how Hockett possessed blood-stained pillowcases from the victim's room, Hockett's attorney replied in oral argument that he received the pillowcases after the murder. In the state court's post-conviction hearing, Hockett's trial counsel, Richard Gilroy, testified that Hockett "had some pillowcases in his home that had blood of the same type of the victim[, which] ... were taken in th[e] ... search of his home." Similarly, Hockett's other trial attorney, Preston Breunig, stated at the hearing that he believed the victim's blood-stained pillowcases were found in Hockett's apartment. Jones' search of Hockett's home also uncovered a pair of Hockett's tennis shoes that appeared to contain splotches of blood. Carol Kohlmann, a forensic serologist employed by the Indianapolis Police Department Crime Laboratory, testified in the state post-conviction hearing that a preliminary test for blood on the toe of Hockett's right tennis shoe gave a positive reading for blood. Kohlmann ran an additional test on the substance on the tennis shoe, but was unable to obtain a positive confirmation of the blood for there was an insufficient amount of the substance left on the shoe after the original testing procedure.

On May 16, 1980, Hockett was charged with murder and three counts of burglary, robbery, and arson, all in connection with Meyers' murder. The State sought the death penalty for Hockett's role in Meyers' fatal injuries. Hockett initially entered pleas of not guilty to the four count indictment. Prior to trial, the State offered Hockett the following plea agreement:

"The State of Indiana agrees to forgo prosecution of the Defendant, Ralph S. Hockett, on the charge or count of Amended Count V, Death Sentence. The defendant agrees to plead guilty to a charge or count of Guilty as charged to Count I, Murder; Count II, Burglary, Class A Felony; Count III, Robbery, Class A Felony, and Count IV, Arson, Class A Felony. At the time of the taking of the guilty plea, and again at the time of the Defendant's sentencing, the State will make no recommendation as to the sentence to be imposed on the Defendant except as follows: Thirty-five (35) years on Count I and Thirty (30) years on each of the other counts, all to run concurrently."

In return for the guilty pleas, the State agreed to drop its request for the death penalty.

On August 25, 1981, Hockett appeared in the state trial court for a hearing on his motion to suppress evidence.[1] Prior to this suppression hearing, Breunig and Gilroy, Hockett's trial attorneys, spent approximately 1 to 1.5 hours discussing with their client the overwhelming evidence incriminating him in the offenses charged and explaining the maximum and minimum possible sentences he could receive should he accept or refuse the plea agreement. Hockett claims that one of the items of evidence the attorneys told him was in the State's possession was a pair of his tennis shoes stained with the murder victim's blood. Hockett testified that he agreed to plead guilty to the four count indictment after his attorneys told him they had seen his tennis shoes stained with the victim's blood because "then I knew that if the State had a pair of tennis shoes to go in front of a jury, that I would in all likelihood go to the electric chair."

During the suppression hearing in the trial court, Hockett's attorneys requested leave to withdraw the petitioner's pleas of not guilty to the indictment and enter a plea of guilty to the four counts pursuant to the terms of the plea agreement. At this time, Hockett stated 1) that he understood that by pleading guilty he would forfeit his rights to a jury trial and to confront his accusers, 2) that he had an opportunity to consult with counsel before entering his guilty pleas, and 3) that he was voluntarily and knowingly pleading guilty to murder, robbery, burglary and ar-

1. Hockett was attempting to suppress various items the law enforcement officials seized when they searched his home, such as Meyers' two television sets, the owl figurine, two blood-stained pillowcases (one gold and one flowered), and several articles of Hockett's clothing.

son. When the court asked, "Has anybody promised you, threatened you, coerced you, in any way to enter this plea," the petitioner answered, "No, sir." The record reveals that prior to his guilty plea hearing, Attorney Gilroy advised Hockett of the "penalties ... for which ... he was charged, [and] the crimes for which he was charged." Further, Gilroy stated that he "discussed [with Hockett] all of the penalty possibilities, maximum, minimum, and ... discussed ... the fact that he was charged with a crime punishable by death in the electric chair." The prosecutor, Greg Harrison, gave a factual basis for the guilty plea and also stated that witness Robert Brunner observed Hockett leaving Meyers' residence in a Chrysler automobile shortly before the fire started; that Hockett admitted to being present when Meyers was killed; and that he admitted to leaving with one of Meyers' television sets after the murder. On September 21, 1981, the state court accepted Hockett's guilty pleas.

Before his sentencing hearing, Hockett requested that Breunig send him a copy of the laboratory report of the tests run on his tennis shoes and the items of Meyers' personal property found at Hockett's house. Breunig agreed to copy Hockett's file, including the laboratory report, and Hockett received copies of the file and the laboratory report after the date of sentencing. During his sentencing hearing, Hockett testified that he was voluntarily and knowingly pleading guilty to the charged offenses. The trial court sentenced Hockett to 35 years imprisonment for the murder count and 30–year terms of imprisonment for each of the burglary, robbery, and arson counts, all to run concurrently. Hockett signed a plea agreement and was informed at his guilty plea hearing that this was the sentencing recommendation of the state.

### B. *Post–Conviction Relief Petition*

On September 2, 1985, approximately four years after Hockett entered his plea of guilty, he filed a Petition for Post–Conviction Relief in the Indiana court system claiming that he was denied effective assistance of counsel and that he did not knowingly and voluntarily plead guilty in 1981 to the mur-

der, burglary, robbery and arson counts because he was inaccurately advised by his attorneys that the State had in its possession a pair of Hockett's tennis shoes stained with the murder victim's blood. The post-conviction trial court held an evidentiary hearing on Hockett's claims. At the hearing, Hockett stated that one of his attorneys, Breunig, advised him before the motion-to-suppress hearing that he (Breunig) had seen the blood-stained tennis shoes. Hockett claims that his other attorney, Gilroy, joined in the conversation about the tennis shoes and that both attorneys informed him "that the State had in their possession a pair of tennis shoes with the victim's blood on it."

Further, the post-conviction record reveals that in Hockett's guilty plea hearing, the prosecutor erroneously stated:

> "Additionally found in the execution of the search warrant were a pair of tennis shoes containing what appeared to be splotches of blood. They were examined by laboratory technicians and medical personnel and were determined to be the same blood type as that of the victim in this case, Clyde T. Myers [sic]."

Hockett's attorneys testified in the post-conviction hearing that they attached no significance to the stained tennis shoes evidence in light of the other evidence implicating Hockett in the crimes.

After conducting the evidentiary hearing on Hockett's claims, the post-conviction court made the following findings:

> "c. *Deputy Prosecutor Garrison testified at the guilty plea hearing* that a pair of tennis shoes were found during a search at Petitioner's residence and *that there were splotches of blood on the shoes of the same blood type of the victim, when in fact the preliminary tests made by laboratory technicians did not show that the blood on the tennis shoes was the same type as that of the victim.*
>
> \*     \*     \*     \*     \*     \*
>
> "f. *Attorneys Gilroy and Breunig both testified that even if the blood found on Petitioner's shoes was not the same type as the victim, that the nature and the amount of evidence against the Petitioner,*

including the fact that the Petitioner was at the scene of the murder and burglary shortly after they had occurred, and did not have any explanation for being present, *and that several possessions of the victim's, including some of the victim's blood type on them, were found in the possession of the Petitioner, led them to believe that the State had a strong case against Petitioner.*

"g. *Mr. Breunig, Mr. Gilroy and Mr. Hill [law clerk] discussed with the Petitioner the fact that a police laboratory report referred to a substance found on the Petitioner's tennis shoes that tested positive for blood* in a preliminary test, but *could not be verified as blood in a later testing* because of an inadequate test sample.

            *   *   *   *   *   *

"i. *Mr. Breunig's and Mr. Gilroy's recommendations to the Petitioner that he plead guilty* to the charges against him in return for a recommended sentence of 35 years in prison for the murder count and 30 years in prison for each of the other counts, the sentences to run concurrently, *was based on the totality of the evidence against the Petitioner, not on any one item of evidence, and on the brutality of the crime which, in the opinion of Mr. Breunig and Mr. Gilroy, made the imposition of the death penalty a significant possibility.*"

*Hockett v. State of Indiana*, Cause No. CR80–162C (January 17, 1986) (Amended Findings of Fact, ¶ 11) (emphasis added). The state trial court rejected Hockett's petition for post-conviction relief, the state appellate court affirmed the denial, and the Indiana Supreme Court denied review.

### C.  *Habeas Corpus Petition*

On August 29, 1989, Hockett filed a *pro se* petition for habeas corpus relief pursuant to 28 U.S.C. § 2254 in the district court. In his habeas petition, Hockett claimed that he based his decision to plead guilty in state court on inaccurate information that the State had in its possession a pair of his tennis shoes stained with the murder victim's blood. Hockett's petition alleged three grounds for relief: (1) that his guilty pleas were not entered knowingly, voluntarily, and intelligently; (2) that he was denied his Sixth amendment right to effective assistance of counsel; and (3) that because of prosecutorial misconduct he was denied his due process rights under the Fifth and Fourteenth Amendments, and his right to a fair trial under the Sixth Amendment. Initially, the district court stated that it conducted a careful review of the record and determined that Hockett "clearly entered his pleas of guilty knowingly, intelligently, and voluntarily within the mandates of the Constitution as interpreted in *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). *See Johnson v. Duckworth*, 793 F.2d 898 (7th Cir.), *cert. denied* 479 U.S. 937, 107 S.Ct. 416, 93 L.Ed.2d 367 (1986)...." Second, the federal district court stated that it understood Hockett's ineffectiveness claim to mean "that false information by his court-appointed attorneys could have only resulted in a total failure to investigate the crime lab report provided to them by the state, and because of this alleged failure to investigate, the petitioner asserts that he was denied effective assistance of counsel." The district court found that a more careful review of the crime laboratory report would not have "led the attorneys to change their recommendation as to the plea [of guilty]" because the evidence against Hockett, other than the tennis shoe, was more than sufficient to convict him of the crime. Third, the district court found that the "record before the court reveals that the trial court had heard an overwhelming amount of evidence of guilt against the petitioner prior to the prosecutor's misstatement. Therefore, in light of said record, this court concludes that, even assuming that the prosecutor's misstatement of the evidence constituted misconduct, the petitioner was indeed afforded a fair hearing." Accordingly, the district court denied Hockett's habeas petition.

On September 4, 1990, Hockett filed a Motion to Alter or Amend Judgment, asking the district court to vacate its earlier denial of his habeas petition and order a new evidentiary hearing on his ineffective assistance of counsel claim. In response to this motion,

the district court held a hearing on March 26, 1991 and set aside its August 17, 1990 order dismissing the habeas petition, directing both parties to brief the issue of Hockett's entitlement to an evidentiary hearing. The entire record was refiled in the district court on April 25, 1991. After reviewing the record, the district court found that the petitioner's ineffective assistance claim and the facts surrounding that claim were adequately explored in the state court's postconviction hearing. Accordingly, the district court denied Hockett's habeas petition without holding another evidentiary hearing.

## II. *ISSUE*

Hockett contends that the district court erred in refusing to hold a hearing on his claim of ineffective assistance of counsel.[2] Specifically, he argues that an evidentiary hearing is necessary to determine whether his pleas of guilty to murder, burglary, robbery and arson were knowingly and voluntarily given in the light of his allegation that his trial attorneys misinformed him about the tennis shoes stained with the murder victim's blood.

## III. *INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM*

■ Our habeas corpus jurisdiction under 28 U.S.C. § 2254 "is limited to questions of federal and constitutional custody. In other words, 'federal courts can grant habeas relief only when there is a violation of federal statutory or constitutional law.'" *Brewer v. Aiken*, 935 F.2d 850, 854 (7th Cir.1991) (quoting *Haas v. Abraham*, 910 F.2d 384, 389 (7th Cir.1990)). Under 28 U.S.C. § 2254(d), we presume that state court findings of fact are correct if the findings are made after a hearing on the merits, and are fairly supported by the record. *Lewis v. Huch*, 964 F.2d 670, 671 (7th Cir.1992); *Brewer*, 935 F.2d at 855. However, questions of law or mixed questions of fact and law are not entitled to the presumption of correctness. *Brewer*, 935 F.2d at 855; *Summer v. Mata*, 455 U.S. 591, 597, 102 S.Ct. 1303, 1306, 71 L.Ed.2d 480

(1982). Thus, the presumption of correctness does not apply to the state court's ultimate conclusion as to whether Hockett's counsel rendered effective assistance, and we review such a legal question under a *de novo* standard of review. *United States ex rel. Partee v. Lane*, 926 F.2d 694, 700 (7th Cir.1991); *Brewer*, 935 F.2d at 855; *see also Sotelo v. Indiana State Prison*, 850 F.2d 1244, 1247 (7th Cir.1988).

We have stated that in the habeas context, "[a]n evidentiary hearing should be granted when there are important issues of fact which were not adequately developed at trial, the failure to develop facts was not due to the defendant's neglect or deliberate bypass, and the record does not conclusively demonstrate that the petitioner is entitled to no relief."

*United States ex rel. Simmons v. Gramley*, 915 F.2d 1128, 1139 (7th Cir.1990) (quoting *Rosenwald v. United States*, 898 F.2d 585, 588 (7th Cir.1990)). A party alleging an ineffective assistance of counsel claim bears a heavy burden. *United States v. Moya–Gomez*, 860 F.2d 706, 763 (7th Cir.1988). A petitioner alleging ineffective assistance of counsel must demonstrate the following:

"(1) that his attorney's representation fell below an objective standard of reasonableness (*performance prong*), *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 2065 [80 L.Ed.2d 674] (1984), and (2) that there exists a reasonable probability that but for counsel's unprofessional errors, the result of the proceedings would have been different (*prejudice prong*), *Id.* at 694, 104 S.Ct. at 2068."

*United States v. Guerrero*, 938 F.2d 725, 727 (7th Cir.1991).

■ We will begin by addressing whether counsels' advice to plead guilty prejudiced Hockett. The Supreme Court has stated:

"the appropriate test for prejudice ... [requires] ... [t]he defendant must show that there is a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been differ-

2. Hockett does not appeal the district court's finding that no violation occurred in the state trial court under the Fifth and Fourteenth Amendment due process rights and his Sixth Amendment right to a fair trial.

ent. A reasonable probability is a probability sufficient to undermine confidence in the outcome.... The assessment of prejudice should precede on the assumption that the decision-maker is reasonably, conscientiously, and impartially applying the standards that govern the decision."

*Strickland*, 466 U.S. at 694–5, 104 S.Ct. at 2068. Hockett's trial attorneys testified that their recommendation to plead guilty was predicated on the substantial amount of evidence incriminating Hockett in the crimes, regardless of the stained tennis shoes. At his guilty plea hearing, the defendant was asked by the state trial court whether the prosecution's recitation of the evidence against him was "substantially true and accurate." He answered, "yes sir." Initially, Hockett's ex-wife, Deborah Wright, informed Sgt. Jones that Hockett told her a fire was occurring at a particular residence, she drove him to the victim's residence and upon arriving, they discovered there were no fire units on the scene. The petitioner and Wright went to a location nearby and called the 911 exchange and reported the fire. Shortly thereafter, the fire department responded to the fire at the victim's residence. Wright told Jones that after calling 911, Hockett returned to the victim's residence, but was denied entry by the fire department units working at the fire scene. Second, witness Brunner identified Hockett as the driver of a Chrysler automobile leaving the victim's home shortly before the fire began in Meyers' residence; witness Matthews placed Hockett and the Chrysler in the vicinity of the victim's house 45 minutes before the fire started. Third, Hockett confessed to the following in his statement to officer Jones: he was present when one or more assailants beat Meyers to death; he carried one of the victim's television sets out of Meyers' house and admitted having possession of the victim's two television sets; and he had possession of Meyers' hurricane lamps and an owl figurine. Fourth, a police search of Hockett's home soon after the crime uncovered personal property of the victim (i.e., TV sets, lamps, and the owl figure). In addition, Attorney Gilroy testified that several pillowcases were found by the law enforcement officers during the search of the petitioner's

house, and that at least one was stained with the blood of the victim's blood type. Hockett testified that he understood his attorneys were attempting to suppress all the evidence the law enforcement officers seized from his house pursuant to a search warrant when he answered the following questions:

"Q. When did [your attorneys] tell you that, about the shoes?

A. It was on the day of the ... guilty plea hearing, which was supposed to have been a suppression hearing that day.

\*   \*   \*   \*   \*   \*

Q. Did they discuss the evidence that was obtained from your house that was found to be stolen property, stolen from the victim?

A. It was all the evidence. The way I understood it, all the evidence was going to be suppressed."

In response to the question, "Did you ever tell Ralph Hockett that you actually saw his tennis shoes and saw that they were covered with blood?", Attorney Breunig testified that, "I may have ... I just cannot be specific." Hockett's other attorney, Gilroy, stated that he could not remember whether or not he told Hockett that the blood on the shoes was the same blood type as that of the victim. Gilroy further testified that he and Breunig informed Hockett of all of the facts in his case, the charges against him, and the fact he was facing the death penalty. In the post-conviction hearing, Hockett testified that attorneys Breunig and Gilroy discussed the stained tennis shoe evidence against him immediately prior to the suppression hearing:

"Q. Okay. At your initial trial level proceedings in this case, uh, who—what attorney represented you?

A. Preston Breunig and Richard Gilroy.

\*   \*   \*   \*   \*   \*

Q. Okay. And do you recall having discussed the evidence that the State had to convict you of this crime, Mr. Breunig?

A. Just one (1) piece of evidence.

Q. Okay. And what was that?

A. Some tennis shoes that the State supposedly had.

Q. Was there anything unusual about these tennis shoes that Mr. Breunig felt was important you should know?

A. I was told that, uh, they had the, uh, victim's blood on 'em.

Q. Who told you that?

A. Preston Breunig and Richard Gilroy.

Q. Okay. When did they tell you that, about the shoes?

A. It was on the day of the ... guilty plea hearing, which was supposed to have been a suppression hearing that day.

Q. Did they ever discuss these tennis shoes with you prior to that day?

A. The only other mention of, of any evidence was Mr. Breunig and his clerk, who I don't know, had stated that, that the evidence was going to be suppressed.

Q. Did they discuss the evidence that was obtained from your house that was found to be stolen property, stolen from the victim?

A. It was all the evidence. The way I understood it, all the evidence was going to be suppressed. There was not specific mention of any specific evidence, other than the tennis shoes.

Q. Did they ever discuss any pillowcases with you that had blood on them?

A. No, sir.

Q. Did they show you any reports prepared by the Marion County Sheriff's Crime Lab?

A. No, sir.

Q. Did they discuss any reports from the Crime Lab with you?

A. No, sir.

Q. Did they ask what type of blood you had?

A. No, sir.

Q. What type of blood do you have?

A. I believe it's O.

Q. Okay ... did the attorneys discuss ... these tennis shoes with you ...

at the holding area near the courtroom prior to the motion to suppress hearing?

A. Yes, sir.

Q. Okay. And ... do you recall anything ... they said in regards to describing the shoes?

A. They told me they had seen the shoes, that the—they were both right, they did spend a great deal of that morning with me. But it was trying to get me to take the guilty plea.

Q. Now, who told you that, that he saw the shoes?

A. Preston Breunig.

Q. And did Gilroy say he saw the shoes?

A. Later on in the conversation, yes.

\* \* \* \* \* \*

Q. ... Mr. Hockett, what did the attorneys, then, tell you about the shoes that you were being, uh told of?

A. When they told me that the State was in possession of my tennis shoes, I told them the only way that those shoes could have blood on them is if somebody put them there. Mr. Breunig stated, well, we've seen them, so think what you want to.

Q. Did he tell you the blood was the same type as the victim?

A. He just told me the—no, he didn't say the same blood type as the victim. He said the victim's blood.

Q. Okay ... were you in the courtroom, then, at the guilty plea proceeding when the Prosecutor gave a factual basis for the plea?

A. Yes, sir.

Q. Do you recall the Prosecutor stating on the record that the blood on the shoes was the same type as the victim?

A. Yes, sir.

Q. Had you personally seen any indication that this was indeed evidence that was available? Had you seen the shoes?

A. I never saw anything. Mr., uh, Gilroy told me that, that those shoes and the pictures of the crime scene would be entered as evidence and that would be the evidence that would get me the electric chair."

Breunig's law clerk, Ralph Hill, testified that Hockett told Hill that he was present when Meyers was beaten to death, that blood was throughout the room and that blood had gotten on Hockett. Hill testified that the petitioner also claimed that the assailants forced him (Hockett) to move Meyers' body, and that he returned to the victim's home while it was on fire and walked around the victim's body and on the blood splattered floor getting blood "all over him."

The petitioner also denies that he spoke with Breunig's law clerk, Hill, concerning the details of the four counts against him:

"Q. Okay. You were here in court when Mr. Hill just testified, isn't that correct?

A. Yes, sir.

Q. Okay. Did you recognize Mr. Hill?

A. Yes.

Q. And how was it that you were able to recognize him?

A. I recognize his face, I mean it had been a while, but . . .

Q. What contacts do you recall meeting him before?

A. Mr. Breunig had brought him up to the jail to me.

Q. And what relationship did you have with Mr. Hill?

A. Mr. Breunig said that—wanted me to go through the file and to be sure—through his file and my file—and to see that I had a copy of everything that was—that Mr. Hill or that Mr. Breunig had in his file and if not, I was to write it down and give it to Mr. Hill so he could get me a copy.

Q. Okay. And do you recall talking to Mr. Hill a number of times about this case?

A. *We never discussed evidence or particular happenings of the case* because Mr. Breunig had instructed both of us not to. If I had any questions, I was just to write them down, put them in an envelope, give them to Mr. Hill and Mr. Hill would take them to Breunig.

Q. Okay. *Did you ever talk to Mr. Hill about being present at the scene of the homicide?*

A. No, sir.

Q. *Did you ever tell Mr. Hill that you were present inside the Meyer's residence . . .*

A. No, sir.

Q. *. . . at any time?*

A. No, sir.

Q. *Did you ever tell him that you moved the body of the victim around?*

A. No, sir.

Q. *Did you ever tell this type of a story to anyone about being in the residence moving the body?*

A. No, sir, I was instructed by Mr. Breunig that I was not to discuss anything with Mr. Hill and Mr. Hill was advised the same thing and that if I had any questions, I was to write them down, put them in an envelope and Mr. Hill would take them to Mr. Breunig.

Q. And you've heard what Mr. Hill has testified to here today, haven't you?

A. Yes, sir.

Q. *And it is your statement that what he testified to was not exactly accurate?*

A. *For the most part they were false, his statements.*

Q. What specifically did you find that was false in his statements?

A. Any statements—or any answers that he gave about me being in the house or anything about moving bodies or anything like that because I was told and I repeat specifically by Mr. Breunig not to discuss it with Mr. Hill. And Mr. Hill was told specifically by Mr. Breunig not to dis-

cuss the case with me. If I had any questions, he would take them to Mr. Breunig.

Q. Did you discuss anything at all about your case with Mr. Hill?

A. No, sir. Mr. Breunig never even questioned me about the case.

Q. Did you discuss the motion to suppress and how that was coming along?

A. The only time that Mr. Hill said anything to me specifically about anything was on the last visit which I can't remember the time but it was before the suppression hearing and he told me that Mr. Breunig said that we had them in the suppression hearing, that we would win the suppression hearing. And I said, 'What—can you give me any more?' And he said, no, he couldn't offer me any more than that."

\* \* \* \* \* \*

*CROSS–EXAMINATION*

"Q. Well, Mr. Hockett, that leaves just about where we left off on September 27th then, doesn't it? *You sit here and listen to all our evidence and then you get up and say, yeah, but they're all lying.* I mean that's really what it all boils down to, isn't it? You're just saying everything that Mr. Hill, that goes against you, it must be untrue?

A. Yes, sir."

(Emphasis added). The record reveals that Hockett claimed on post-conviction relief that his attorneys and Breunig's law clerk, Hill, were all lying concerning (1) his (Hockett's) admission to being in the residence when the assailants murdered the victim, (2) that he moved the victim's body, or (3) that he was present at the scene of the crime. In light of the testimony from Gilroy, Breunig and Hill and Hockett's confession to Sgt. Jones, admitting being present at the crime scene and possessing the victim's personal property in his house (two television sets, two hurricane lamps, an owl figurine), the Petitioner's credibility is called into question in refuting Hill's testimony and denying he was ever in Mey-

er's house, or witnessed the crime, or moved the victim's body.

The following testimony of Hockett's attorneys recounts that the petitioner understood that the overwhelming evidence against him, without the stained tennis shoes, was sufficient to convict him of the charged crimes. Gilroy testified that the stained tennis shoes

"[were not] critical in this case. Especially in view of the fact that Mr. Hockett had some pillowcases in his home that had blood of the same type of the victim. And they were taken in that ... search of his home. So, whether he had it on his shoes or on pillowcases, it didn't make much difference, I don't think."

Gilroy explained the stained tennis shoes were "insignificant" because of the other evidence implicating Hockett in the crimes:

"In this particular case, I think you have to look at the totality of the evidence. I think ... the fact that somebody has Type O blood on shoes is not necessarily critical to any case. If that was the only evidence that they had against Mr. Hockett, ... then it definitely would be ... somewhat significant. But then again, it's possible for a lot of people to have Type O blood on tennis shoes.... [I]f you look at the totality of the evidence in this particular case, which includes several statements by the Defendant, one in which he ... admits to having some dream about being there at the time [of the murders]; secondly, the ... defendant was seen at the ... home of the victim ... within minutes after the fire department arrived; and, third, they found ... in Mr. Hockett's home items of property that belonged to the victim shortly after the crime was committed.... [I]f you look at the totality of the evidence here, the blood on the shoes was very, very insignificant."

In response to the question during the post-conviction hearing, "I understood you in your testimony to have indicated that there was a positive blood typing on a pillowcase ...," Gilroy answered, "[Y]es, sir ... there was several pillowcases found, I believe, with staining on it, and ... at least one (1) ... had type O blood on it, yes, sir."

Attorney Breunig also testified that little emphasis was placed on Hockett's tennis shoes when he and Gilroy recommended the guilty plea. Breunig stated that part of the evidence against Hockett included "a pillowcase where blood was found, and I believe the pillowcase contained the victim's personal property taken ... at the time the murder occurred." Breunig stated that even assuming he was unaware of the tennis shoe evidence, he would not have altered his recommendation to Hockett to plead guilty:

"I don't recall any emphasis at all being placed on Mr. Hockett's tennis shoes, the fact that there may or may not be human blood on them.... [E]veryone conceded, including Mr. Hockett, that he was at the crime scene. As a matter of fact, Mr. Hockett conceded on some occasions that he was at the scene more than once. So, I mean, I don't see that Mr. Hockett would have been concerned that some blood might have been found on his shoes. And I certainly wasn't. The ... firemen all said they had to kind of shoo him out of the place when they arrived or during the course of their putting out the fire. So there was just no emphasis at all on the tennis shoes."

The Supreme Court's analysis in *Hill v. Lockhart*, 474 U.S. 52, 59, 106 S.Ct. 366, 370, 88 L.Ed.2d 203 (1985) is particularly relevant in this connection:

"[W]here the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error 'prejudiced' the defendant by causing him to plead guilty rather than go to trial *will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea.* This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial."

(emphasis added). Here, even if we assume that Hockett received incorrect information about the exact nature of the state's evidence against him, Hockett was not prejudiced because it is clear that his counsel, aware of the totality of the overwhelming evidence against his client, would still have recommended that Hockett plead guilty, regardless of the quality of the tennis shoe evidence.

We also note that a letter dated March 16, 1982 that Hockett introduced at the post-conviction hearing wherein Gilroy stated to him that "the blood on the shoes was the same blood type as the victim," was written 6 months after Hockett entered his guilty pleas on September 21, 1981. The petitioner does not claim that Gilroy's March 16, 1982 letter induced him to plead guilty to the four counts. In light of the 6 months time period, Hockett cannot demonstrate he was influenced to plead guilty due to Gilroy's March 16, 1982 letter.

Moreover, the petitioner clearly knew the stained tennis shoe evidence was only a small part of the total amount of overwhelming evidence that the state had against him. Hockett understood that he was facing the death penalty for crimes supported with an overwhelming amount of evidence linking him to the murder victim and the scene of the crime. Hockett, an educated person who attended one year of junior college, testified at the acceptance of his guilty plea hearing in response to the court's questions:

"Q. Have you discussed this matter with your attorneys, Mr. Breunig and Mr. Gilroy?

A. Yes sir.

Q. Are you satisfied with the way that they have represented you in this case?

A. Yes sir.

Q. Do you feel like there is anything that Mr. Breunig and Mr. Gilroy have not done that they could have done for you?

A. No sir.

Q. Do you understand that the pleadings and documents that have been submitted to the Court indicate that you are offering to plead guilty to certain charges?

A. Yes sir.

Q. Do you understand that the Court is absolutely no part of this plea agreement?

A. Yes sir.

Q. Do you understand that by pleading guilty you are admitting as true all of the facts alleged in the Information to the point to which you entered a plea of guilty? Do you understand that?

A. Yes sir.

Q. Do you understand if I accept this plea of guilty I will proceed with judgment and sentencing in this matter?

A. Yes sir.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. Has anybody promised you, threatened you, coerced you, in any way to enter this plea?

A. No sir.

Q. Is this something that you are doing of your own free will?

A. Yes sir.

Q. And you have discussed this matter with your attorneys, Mr. Breunig and Mr. Gilroy?

A. Yes.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. Is there anything whatsoever that you don't understand about this?

A. No sir.

Q. Have you had a sufficient time to talk with Mr. Breunig and Mr. Gilroy to make up your mind in a calm atmosphere?

A. Yes sir."

At the sentencing hearing, the district court asked Hockett the following questions:

"Q. Mr. Hockett, have you had a chance to review all these documents that have been submitted to the Court?

A. Yes, sir.

Q. On the 25th of August you offered a plea of guilty in this case, do you recall that?

A. Yes, sir.

Q. Have you discussed these matters with your attorneys' Mr. Breunig and Mr. Gilroy?

A. Yes, sir.

Q. Are you satisfied with the way that they have represented you in this matter?

A. Yes, sir.

Q. Do you feel like that there is anything whatsoever, Mr. Breunig and Mr. Gilroy have not done that they could have done for you in this case?

A. No, sir.

Q. Do you feel like they represented you in a competent and fair manner?

A. Yes, sir.

Q. Have you understood everything that has gone on in this Court?

A. Yes, sir.

Q. Do you recall those rights that I read you?

A. Yes, sir.

Q. Is there anything whatsoever that you don't understand about this case?

A. No, sir."

Based on the foregoing record, it is apparent that Hockett understood the overwhelming amount of evidence against him was sufficient to convict him on the crimes charged and could very well send him to the electric chair. It is evident from the record that Hockett well knew and understood that evidence other than the stained tennis shoes existed to place him at the scene of the crime, such that any misinformation concerning the tennis shoes was not the controlling factor in inducing him to plead guilty. Even if Hockett had been advised that the second laboratory test on his shoes for blood was inconclusive, it is reasonable to conclude that knowing the wealth of other evidence incriminating him, Hockett's decision to plead guilty and avoid the possible imposition of the death penalty would not have changed.

Because Hockett realized the totality of the overwhelming evidence against him and understood that his counsel considered the stained tennis shoes as insignificant evidence in recommending the guilty plea, he has failed to establish that his guilty pleas were not knowingly and voluntarily given. We conclude that Hockett has failed to establish the required showing of prejudice under

**1172**

*Strickland* to demonstrate that his trial counsel was ineffective and that he would not have pled guilty even had he known that the blood tests on his tennis shoes were inconclusive.[3] *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2068. "When we determine that appellant has failed to demonstrate error on either prong of the *Strickland* test, we need not address the other." *Chichakly v. United States,* 926 F.2d 624, 630 (7th Cir.1991). Therefore, we need not determine whether Hockett's attorneys' performance failed to meet an objective standard of reasonableness. *Pittman,* 960 F.2d at 692; *Velarde v. United States,* 972 F.2d 826, 828 (7th Cir. 1992); *Chichakly,* 926 F.2d at 630.

The district court properly determined that another evidentiary hearing was unnecessary to determine whether Hockett knowingly and voluntarily pleaded guilty to the four crimes charged because the state court's post-conviction hearing sufficiently covered, explained and recited all the evidence against Hockett. Moreover, the post-conviction state court considered whether Hockett relied on the stained tennis shoes evidence in his decision to plead guilty, and found that based on the totality of the overwhelming evidence against the petitioner, his attorneys' recommendation to plead guilty was reasonable. Because a further evidentiary hearing would not shed any new light on the petitioner's reliance on the stained tennis shoe evidence, the misrepresentation that blood stained the tennis shoes and the reasons for the trial attorneys' guilty plea recommendation, we agree with the district court that Hockett's ineffective assistance claim must fail.

### IV. CONCLUSION

We conclude that the district court properly denied Hockett's petition for habeas relief without holding a second evidentiary hearing. The judgment of the district court denying the petitioner's Writ of Habeas Corpus is

AFFIRMED.

---

**3.** Hockett claims that 28 U.S.C. § 2254(d)(8) entitles him to an evidentiary hearing in the district court because the post-conviction state court's findings of fact are "not supported by the evidence and are against the weight of the evidence ..." Section 2254(d) does not entitle Hockett to an evidentiary hearing by itself; it merely permits a federal district court reviewing a habeas petition to apply a presumption of correctness to a state court's factual determinations. While the district court recognized that the presumption of correctness in § 2254(d) applies to a post-conviction state court's findings of fact, the district court made an independent examination of the state court record pursuant to *Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). *See Lane,* 926 F.2d at 700. Specifically, the district court applied the *Strickland* test and analyzed the state court record concerning Hockett's ineffective assistance of counsel claim. Because the district court correctly applied the *Strickland* test and found that his trial attorneys did not prejudice him, Hockett has failed to demonstrate that § 2254(d)(8) justifies granting him a second evidentiary hearing in the district court on his ineffective assistance of counsel claim.