**UNITED STATES ex rel. Walter SUMNER, Petitioner,**

v.

**Odie WASHINGTON, Respondent.**

**No. 93 C 2742.**

United States District Court, N.D. Illinois, E.D.

Dec. 22, 1993.

---

Walter Sumner, pro se.

Roland W. Burris, Atty. Gen., State of Ill., Bradley P. Halloran, Chicago, IL, for respondent.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Walter Sumner ("Sumner") has filed a petition for writ of habeas corpus (the "Petition") under 28 U.S.C. § 2254 ("Section 2254") against Dixon Correctional Center Warden Odie Washington. Sumner challenges his 1988 murder conviction,[1] on which he is now serving a 20 year prison sentence. On appeal, Sumner's conviction and sentence were affirmed by the Illinois Appellate Court, after which the Illinois Supreme Court denied his petition for leave to appeal.

---

1. Since Sumner's conviction the crime of murder has been reclassified as first degree murder (720 ILCS 5/9–1(a)(1) and (2)). This opinion will follow the parties' usage in referring to the crime simply by its former label: murder.

Next Sumner filed a post-conviction complaint in the Circuit Court of Cook County, but that proceeding was dismissed.[2]

Before this Court Sumner asserts that his conviction violated two federal constitutional provisions. For one thing, he claims his Sixth Amendment[3] right to effective assistance of counsel was violated by his attorney's failure (1) to tender a voluntary manslaughter[4] jury instruction, (2) to interview two eyewitnesses—Diane Barnes ("Barnes") and Dave Newsome ("Newsome")—and to call Barnes to testify, particularly after counsel had said in his opening statement that he hoped she would testify, and (3) to withdraw as counsel at the post-trial hearing because of his essential inability to argue his own ineffective assistance at trial as grounds for a new trial. Sumner also claims his Fourteenth Amendment rights to due process and equal protection of law, as well as his right to counsel, were violated when the trial court did not examine defense counsel about the possible neglect of Sumner's defense.

### Relevant Facts

*Sumner v. Mata*, 449 U.S. 539, 544–47, 101 S.Ct. 764, 767–69, 66 L.Ed.2d 722 (1981) and Section 2254(d) make the Illinois Appellate Court's statement of facts presumptively correct, absent exceptions that do not apply here (*Hockett v. Duckworth*, 999 F.2d 1160, 1165 (1993)).[5] This opinion will therefore set out that statement in full (*Montgomery v. Petersen*, 846 F.2d 407, 408 n. 1 (7th Cir. 1988)).

■ But because Sumner's current claims are also based in part on material outside of the trial record—an affidavit by Barnes—this Court is not limited to the state courts' factual determinations (*Sullivan v. Fairman*, 819

F.2d 1382, 1385–87 (7th Cir.1987)). Hence the quotation of the Appellate Court's statement will be followed by a review of that affidavit.

■ Finally, the ultimate question as to whether Sumner's counsel rendered effective assistance is viewed as a mixed question of law and fact. That renders it subject to de novo review (*Strickland v. Washington*, 466 U.S. 668, 698, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984); *Hockett*, 999 F.2d at 1165).

### Appellate Court's Statement of Facts

Here is the Illinois Appellate Court's statement of the facts in the case (*People v. Sumner*, No. 87 C 8293, slip op. 1–6 (Ill.App. 1st Dist. May 14, 1991)):

> The State's evidence was as follows. Estelle Young (Cissy) testified that at the time of this incident, she lived with her husband, John Young (John), in a two-flat in Cicero, Illinois. Tom Patton, Dave Newsome, and Rick Cranston (Rick or the victim) were staying with the Youngs. Bill Pherigo lived upstairs, and Diane Barnes (Diane) was staying with him. All the occupants of the house except Cissy had been drinking beer that night.
>
> At about 5 a.m. on June 7, 1987, John and Cissy had just returned home. A man, Phil Lewis, approached the house and said he was looking for Diane, with whom he left a short time later. Cissy then heard yelling and saw a car drive by with the two inside.
>
> Shortly thereafter, Cissy and John were outside when Diane appeared and ran into the house. Cissy saw defendant walking toward John with a large silver knife in his hand. John ordered his neighbor's Dober-

---

**2.** Sumner's Petition ¶ 10(E) says that he was never notified of that dismissal and that when he did learn of it more than a year after the fact he attempted to file a late notice of appeal, "but to no avail."

**3.** As always, this opinion adheres to the conventional and convenient (though technically imprecise) practice of referring to the underlying Bill of Rights provision (which of course imposes limitations only on the federal government) rather than to the Fourteenth Amendment (which

applies to state actors and has been construed to embody such Bill of Rights guaranties).

**4.** Like the crime of murder, voluntary manslaughter has also since been reclassified—in this instance as second degree murder (720 ILCS 5/9–2(a)(2)). Again this Court, like the parties, will refer to the crime by its former label of voluntary manslaughter.

**5.** Indeed, both sides' current submissions essentially recapitulate that statement.

man pinscher to attack defendant, and when the dog lunged, defendant stabbed it. Cissy ran into the house yelling and woke up the others. Rick, who had been asleep on a couch, ran out wearing only a shirt, pants, and socks.

Cissy, who was watching from the doorway, saw defendant at the foot of the porch steps with the silver knife in one hand and a black object in his other hand. Rick ran out the front door and down the steps; he appeared to fall down the final three steps and landed directly on defendant. Cissy said that Rick did not have anything in his hands as he came out of the house.

Rick and defendant engaged in a struggle which carried them through the front yard and across the street. Rick fell backwards when defendant hit him in the head with the knife; he braced himself with one arm and waved the other in front of him telling the defendant to stop. As Rick tried to turn and run, he slipped on the grass, and defendant, standing over Rick, stabbed him in the back. Rick remained on the ground shaking. Cissy saw John chase defendant and hit him once in the head with a shovel. Defendant ran away, and John apprehended Lewis, who had come with defendant.

John's testimony tracked Cissy's. He said that Lewis initially left with Diane in a car, and someone shouted that they would "be back to kill Billy." A short time later, Diane ran into the house as defendant and Lewis walked toward John, who was in the front yard. Defendant carried a blackjack and a silver butterfly knife, which he was flipping back and forth, and Lewis had a club. John ordered the dog to attack defendant and ran to his truck, which was parked across the street, to look for something with which to defend himself. He next saw Rick punching defendant, and defendant swinging the knife and blackjack. After he found the shovel, John saw Rick lying facedown on the ground; he chased defendant, hitting him once in the head with the shovel as he ran away. Lewis tried to escape in the car, but John captured him. John stated that Rick had no weapon at any point during this incident.

Tom Patton testified that he awakened early on June 7, 1987, when the Youngs arrived home. Later, he heard some commotion and someone yell "Billy, we'll be back." Patton went back to sleep, and was next wakened when he heard that there was a knife fight outside. Patton ran outside, where he saw defendant chase Rick and stab him in the back.

Traci Ihrig, the babysitter who stayed overnight at the Young's residence on June 6, testified that she called the police when the commotion started. She watched the incident from the front porch and saw defendant struggling with Rick. She said that Rick had nothing in his hands when he left the house.

Lewis testified that he was defendant's friend and co-worker. After a few drinks on the morning of June 7, 1987, the two went to pick up Diane. They drove to the house in Cicero where she was staying, and Lewis walked to the house to get her. Several people who were on the porch yelled at him, but he found Diane and took her back to the car. Diane shouted that she would be back, and the people on the porch made provocative gestures toward the car. This upset defendant. They went to Lewis' apartment, but returned to Diane's house so she could get her baby. After returning, both defendant and Lewis got out of the car; Lewis carried a club and defendant carried a butterfly knife in his hand. Defendant was walking toward the house when he was attacked by the dog. Lewis did not remember the rest of the incident because he was struck by one of the men from the house. A few minutes later, Diane was helping him into the car so he could escape when someone grabbed the keys to the ignition and smashed the windows. Lewis stated that he owned a knife and sheath which were in the car on that particular night. He could not recall if defendant ever had that knife during the incident. In his statement to the police immediately following the incident, however, Lewis said that "when he arrived [defendant] jumped out of the car with two knives." He also did not recall seeing anyone except defendant with a knife.

When Cicero Police Officer Ken Beta arrived at the scene, he saw the victim lying facedown and took Lewis into custody. Beta received a description of defendant and the direction in which he fled, and broadcast this information on his radio. He recovered a knife and sheath which were lying in the street.

Cicero Police Officer Robert Negrete heard the description of defendant over his radio while he was in the area toward which defendant was seen fleeing. He saw defendant running and arrested him. Defendant was carrying a riot club and an object resembling a blackjack. He also had a silver butterfly knife covered with blood in his pocket. Negrete said that this type of knife is usually advertised as a martial arts weapon.

Dr. Robert Kirschner of the Cook County Medical Examiner's office performed the autopsy of the victim. The victim died from multiple stab wounds. He had been stabbed in the front right portion of his chest and on the left side of his lower back. He had several cuts and lacerations to his hands and arms, and stab wounds to the head. Kirschner concluded that these injuries were consistent with those that would be caused by the butterfly knife produced at trial.

Defendant testified in his own defense. He said that he always carried the silver butterfly knife and often used it at work, but that he never intended to injure anyone with it. After having some drinks with Lewis on the morning of June 7, 1987, they drove to see Diane, defendant's former girlfriend. Lewis went to the house and brought Diane back to the car. Some people at the house shouted at them, but no one yelled anything from the car. The three left in the car and stopped at Lewis' apartment, where Lewis picked up a riot stick. They took Diane back to get her daughter, and defendant waited outside the car while Diane went into the house. He heard someone say "go get him," and saw a man send a dog after him. Defendant ran toward the house, pulled his knife, and cut the dog. When he was near the house, three or four men ran off the porch and Rick charged him with what appeared to be a knife in his hand. Defendant's arm was cut and his shoulder was punctured. He admitted that he stabbed Rick, but claimed that he feared for his life and did so in self-defense. As he was running away, he was struck once with the shovel.

On cross-examination, defendant admitted that there was a second knife in the car, but that it belonged to Lewis. He claimed that he did not have the riot stick in his hand when Rick emerged from the house, but that he grabbed it from the car as he was fleeing. Further, he claimed that he did not stab Rick in the head, and that the knife which Rick carried was neither of those recovered.

To the extent that any other aspects of the trial record need to be mentioned in order to resolve Sumner's claims, they will be referred to in the course of this opinion's substantive discussion.

*Barnes' Possible Testimony*

Although Sumner's counsel had told the jury in his opening statement that Barnes would "hopefully" testify on Sumner's behalf,[6] she never did appear at trial. In support of his current Petition Sumner has submitted an affidavit of Barnes in which she says this:

> 1. That I was present during the occurance [sic] that resulted in Mr. Walter Sumner being forced to defend himself. I saw him try to avoid the entire incident. I saw him when he was attacked and I saw that he was forced, under fear of death or great bodily harm, to defend himself.

---

**6.** Here is what Sumner's counsel said to the jury on that score (Tr. 126):

> You are going to hear a completely different [version of events] from my client and hopefully from Diane [Barnes] who else [sic] was an occurrence witness. And to that effect, Diane is going to testify that all these people who live in this two-flat—I don't know how many really

lived there, at least eight or nine—had been in the vernacular of the street dropping acid and smoking pot and drinking. And they were mentally confused and aroused. And that my client who had parked his car almost a quarter of a block away to avoid trouble, was himself attacked.

2. That I was informed that I was to testify at Sumner's trial for murder but I was never called nor contacted by his attorney. I was present and prepared to testify but was not contacted, interviewed, subpeonaed [sic] nor otherwise caused to be involved in the trial proceedings.

3. I believe that my testimony would have changed the outcome of the trial in favor of Sumner because;

a. I would have testified that he returned to the scene of the violance [sic] for the sole purpose of picking up my child and NOT to engage in a fight. 

b. That I observed the people who lived downstairs from me attack Sumner with weapons and that his actions were completely defensive.

c. That Sumner's actions were such that he ran from his attackers, that he ran around a car trying to avoid the fight and that he was forced to defend.

d. I observed that he was stabbed and beaten and that the wounds inflicted on the victim occured [sic] during a struggle during which Sumner was visibly in fear of losing his life.

e. That I was present during the entire incident and I feel that my not being called was a mistake on the part of either the attorney representing Sumner or the State. The truth could not have been properly represented, in my opinion, without my testimony.

4. I am submitting this affidavit in the interests of justice.

Barnes also states in a handwritten sworn addition to her affidavit:

I, Diane Barnes, in addition to the first page of testimony would also like to add the following information as it was accidently [sic] left out and I believe it very important to also be known. That shortly before the fight took place that Richard Cranston was drinking and was very intoxicated and I, saw him take L.S.D. (acid). I was not drinking or taking drugs and I observed all of this with my own eyes.

*Procedural Defenses to Section 2254 Claims*

■ Before a district court can address the merits of a Section 2254 petition, the petitioner must have both exhausted and avoided procedural default of all remedies available under state law (*Henderson v. Thieret*, 859 F.2d 492, 496 (7th Cir.1988)). Though sometimes mistakenly confused, those requirements are conceptually discrete.

■ Claims are exhausted when they have been presented to the highest available state court for a ruling on the merits, or when (for whatever reason) state remedies are no longer available (*Engle v. Isaac*, 456 U.S. 107, 125–26 n. 28, 102 S.Ct. 1558, 1570–71 n. 28, 71 L.Ed.2d 783 (1982); *Resnover v. Pearson*, 965 F.2d 1453, 1458 (7th Cir.1992)). Failure to exhaust any claim necessitates the denial of a petition under Section 2254(b) (*Rose v. Lundy*, 455 U.S. 509, 522, 102 S.Ct. 1198, 1205, 71 L.Ed.2d 379 (1982) and its numerous progeny).

■ As for a petitioner's procedural default, that can occur in either of two ways. One involves any petitioner who, although diligently pursuing all appeals required under state law, nevertheless fails to raise the federal claims that he later attempts to assert as the bases for his federal habeas petition (*Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977); *Resnover*, 965 F.2d at 1458).[7] And the other involves any petitioner who neglects to pursue all of the appeals required under state law in a timely manner (*Coleman v. Thompson*, —— U.S. ——, —— n. 1, 111 S.Ct. 2546, 2557 n. 1, 115 L.Ed.2d 640 (1991); *Jenkins v. Gramley*, 8 F.3d 505 at 507 (7th Cir.1993)). If either type of failure results in the forfeiture of the petitioner's federal claims under a state law ground that is independent of his federal claims and is adequate to support his conviction, he has procedurally defaulted those claims (*Coleman*, —— U.S. at ——, 111 S.Ct. at 2565; *Jenkins*, 8 F.3d at 507–08). In that event Section 2254 review is barred unless the petitioner can show either (1)

---

7. This opinion's exclusive use of male pronouns is not a matter of chauvinism. It rather reflects the fact that in this instance the general principles relating to petitioners are being applied only to Sumner—a male.

cause for the default and actual prejudice as a result of the alleged federal violation or (2) a fundamental miscarriage of justice (*Coleman,* —— U.S. at ——, 111 S.Ct. at 2565 (procedural default for failure to pursue available appeals); *Wainwright,* 433 U.S. at 86–87, 97 S.Ct. at 2506–07 (procedural default for failure to raise claim in state proceedings)).

Although nonexhaustion and procedural default are independent grounds for the denial of Section 2254 relief, logic requires that they be addressed in that sequence. First, if a petitioner has failed to pursue still-available appeals required under state law, his petition must be dismissed for lack of exhaustion. But once a petitioner can no longer pursue such appeals as a matter of state law (usually due to a failure to do so within the requisite time period), he has overcome the burden to show exhaustion of state remedies—yet he may be impaled on the other horn of procedural default (*Coleman,* —— U.S. at —— n. 1, 111 S.Ct. at 2557 n. 1):

> [I]f the petitioner failed to exhaust state remedies and the court to which petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred ... there is a procedural default for purposes of federal habeas.

■ Avoidance of procedural default for that purpose requires that each claim have been "fairly presented" to the state courts—that is, both the factual basis and the federal legal theory supporting it must have been set forth by the petitioner (*Picard v. Connor,* 404 U.S. 270, 275–76, 277, 92 S.Ct. 509, 512–13, 30 L.Ed.2d 438 (1971); *Verdin v. O'Leary,* 972 F.2d 1467, 1472–73, 1475 (7th Cir.1992)). That may be done in any one of four different ways (*United States ex rel. Sullivan v. Fairman,* 731 F.2d 450, 454 (7th Cir.1984), quoting *Daye v. Attorney General of New York,* 696 F.2d 186, 194 (2d Cir.1982) (en banc)):

**8.** That rule applies to "constitutional as well as other issues" (*People v. Precup,* 73 Ill.2d 7, 16, 21 Ill.Dec. 863, 867, 382 N.E.2d 227, 231 (1978); see also *People v. Free,* 122 Ill.2d 367, 380, 119 Ill.Dec. 325, 331, 522 N.E.2d 1184, 1190 (1988)

(a) rel[y] on pertinent federal cases employing constitutional analysis; (b) rel[y] on state cases employing constitutional analysis in like fact situations, (c) assert[ ] the claim in terms so particular as to call to mind a specific right protected by the Constitution, ... [or] (d) alleg[e] a pattern of facts that is well within the mainstream of constitutional litigation.

Although a petitioner need not cite "book and verse on the federal constitution" to present a constitutional claim (*Picard,* 404 U.S. at 278, 92 S.Ct. at 513), neither is any one of the four *Sullivan* factors automatically sufficient to avoid forfeiture of a claim (*Sullivan,* 731 F.2d at 454 n. 9). Instead the ultimate determination that must be made in assessing the issue of fair presentment is "whether the state court was sufficiently alerted to the federal constitutional nature of the issue to permit it to resolve that issue on a federal basis" (*Verdin,* 972 F.2d at 1476).

■ While federal law determines the specificity with which a claim must be asserted in state court to preserve it for Section 2254 review, state law determines when a claim must be asserted and how far appeals must be taken to avoid procedural default (*Coleman,* —— U.S. at ——, 111 S.Ct. at 2565; *Jenkins,* 8 F.3d at 508). Under Illinois law a claim that can be raised on direct appeal but is not is waived, and it may not be reviewed in any later direct or collateral appeal (*People v. Barnard,* 104 Ill.2d 218, 228, 83 Ill.Dec. 585, 588, 470 N.E.2d 1005, 1008 (1984)).[8] Indeed, the scope of collateral review allowed under the Illinois Post–Conviction Hearing Act (725 ILCS 5/122–1 to 122–7) extends only to claimed breaches of constitutional rights that were not and could not have been asserted on direct appeal (*id.* 5/122–3; *People v. Flores,* 153 Ill.2d 264, 274, 180 Ill.Dec. 1, 5, 606 N.E.2d 1078, 1082 (1992); *People v. Enoch,* 146 Ill.2d 44, 45, 59, 165 Ill.Dec. 719, 722, 726, 585 N.E.2d 115, 118, 122 (1991)).

(Ryan, J., concurring) (as the result of procedural default, trial errors "are forfeited and may not be raised on review, even though they may have involved constitutional questions")).

There are some limited exceptions to the last-stated rule, but they do not apply to the claims that Sumner asserts here. As all of his claims were known to him either by the end of trial or at the time of his post-trial hearing, the only state remedies available to him were those on direct appeal. Because collateral review was therefore unavailable, Sumner's attempted use of that route is irrelevant for the purposes of both exhaustion and procedural default (Section 2254(c)). Consequently Sumner has clearly exhausted state remedies by his direct appeal to the Illinois Appellate Court and his attempted (but rejected) appeal to the Illinois Supreme Court. This opinion will therefore focus exclusively on the question of procedural default.

In answering Sumner's Petition the Attorney General raises that issue in response to some, but not all, of Sumner's four claims. Because that constitutes an effective waiver of any contention as to procedural default on those other claims (*Henderson*, 859 F.2d at 497–98), this opinion will rehearse each of the claims just enough to identify which are covered by that waiver, addressing the substantive issue of procedural default only as to the others.

*Voluntary Manslaughter Instruction*

On direct appeal to the Illinois Appellate and Supreme Courts Sumner explicitly raised the fact of his lawyer's "fail[ure] to tender a voluntary manslaughter instruction" as the basis of an ineffective assistance of counsel claim (Br. 5, 23; Pet. 3, 13–15 [9]). In support of that contention he cited *United States ex rel. Barnard v. Lane*, 819 F.2d 798, 803–05 (7th Cir.1987), which held in circumstances arguably similar to Sumner's [10] that failure to submit such an instruction constituted ineffective assistance of counsel in violation of the Sixth Amendment (Br. 25–26; Pet. 14). Because the Attorney General has gone directly to the merits of that issue before this Court without any suggestion of a

procedural default (Mem. 6–10), the issue is ripe for this Court's resolution on the merits.

*Interviewing and Calling Witnesses*

As already stated, Sumner's second current claim of ineffective assistance of counsel points to his trial lawyer's failure to interview Newsome and Barnes and to call Barnes as a trial witness. In response the Attorney General's Mem. 10 contends that Sumner defaulted that claim by failing to raise it before the Illinois Supreme Court.

■ It is true that Sumner's petition to the Illinois Supreme Court made no reference to counsel's failure to interview Newsome. Because that contention was not presented to the Illinois Supreme Court at all, Sumner has indeed defaulted procedurally so as to be barred from raising it as the factual basis of a Section 2254 claim.

■ As for the failure to interview Barnes and to call her to testify, Sumner's petition for leave to appeal did not raise those matters as an independent claim necessitating review. Instead Sumner contended before the Illinois Supreme Court that review should be granted to decide whether under state law the trial judge had improperly failed to order a new post-trial hearing to determine if trial counsel had been ineffectively (Pet. 3, 20). In that respect Pet. 21 argued counsel's failure to interview Barnes and to call her to testify (despite counsel's having told the jury in his opening statement that they would "hopefully" hear from her) only as evidence of counsel's underlying ineffectiveness at trial. Sumner urged that "[f]ailure to investigate known witnesses whose testimony may be exonerating is an indication of incompetence, as is promising to the jury that they will hear a witness who is never called" (Pet. 24). As legal support for those propositions he cited *People v. Greer*, 79 Ill.2d 103, 37 Ill.Dec. 313, 402 N.E.2d 203 (1980) and *Anderson v. Butler*, 858 F.2d 16 (1st Cir.1988).

---

9. Sumner's brief to the Illinois Appellate Court and his petition for leave to appeal to the Illinois Supreme Court will respectively be cited in the manner employed in this parenthetical reference.

10. As the later discussion in this opinion reflects, there are critical (and dispositive) differences between *Barnard* and this case. But for purposes of the procedural default issue, it is enough that Sumner sought to rely on that federal constitutional decision before the state courts.

If Sumner had rather set forth that claim as an independent issue, standing apart from others, it clearly would have been "fairly presented" within the meaning of *Picard.* Certainly he disclosed the factual basis of the claim. And as for the federal legal theory, it was sufficiently presented under not just one but two of the *Sullivan* factors. For one thing, the petition relied on a federal case employing relevant constitutional analysis, for *Anderson* held a failure of trial counsel to call witnesses referred to in his opening statement to be ineffective assistance of counsel (858 F.2d at 18–19). For another, Sumner additionally invoked a "state case[ ] employing constitutional analysis in [a] like fact situation[ ]" by reference to *Greer,* which assessed the possibility that failure to interview witnesses indicated ineffective assistance of counsel (79 Ill.2d at 123, 37 Ill.Dec. at 322–23, 402 N.E.2d at 212–13).[11]

But it still remains to be decided whether the claim was "fairly presented" to the Illinois Supreme Court, given that it did not stand as an independent issue but was instead raised to support the request for a new post-trial hearing.[12] In light of the overall context of the submission, the answer must be "yes."

What controls in that respect is that Sumner was plainly requesting a new post-trial hearing not for its own sake, but rather so that the merits of the claimed violation of his Sixth Amendment right to effective assistance of counsel could be addressed at that hearing. If Sumner had no ineffectiveness claim, he would have no grounds on which to request a new hearing. To be sure, the Illinois Supreme Court could have granted Sumner a new hearing without addressing the merits of that claim, leaving it to be adjudicated on remand—but that grant would necessarily have involved a threshold evaluation of the underlying claims that Sumner was asserting.[13]

Both *People v. Krankel,* 102 Ill.2d 181, 189, 80 Ill.Dec. 62, 66, 464 N.E.2d 1045, 1049 (1984) and *People v. Holmes,* 141 Ill.2d 204, 231, 152 Ill.Dec. 268, 280, 565 N.E.2d 950, 962 (1990), which Sumner cited at Pet. 23–24, confirmed the right to new post-trial hearings in similar circumstances while at the same time declining to address the underlying ineffective assistance claims, expressly leaving them to be determined on remand. But those cases could arguably support Sumner's request only if he had a potentially viable ineffective assistance claim to be addressed on remand. Because his petition to the Illinois Supreme Court did identify the claim of counsel's failure to interview Barnes and to call her as a trial witness as the necessary and explicit predicate of another claim, those claims were fairly presented to the Illinois Supreme Court and may now be advanced in a Section 2254 proceeding.

*Post–Trial Hearing*

■ Sumner's next claim is based on his trial counsel's failure to withdraw at the post-trial hearing, despite the asserted conflict of interest engendered by counsel's inability to argue his own ineffectiveness at trial as grounds for a new trial. Here the Attorney General has explicitly acknowledged (at his Mem. 15) that Sumner raised that claim in the "appropriate state courts." That acknowledgement operates as an explicit waiver of the defense of procedural default, so

---

11. Indeed, the Sixth Amendment and Supreme Court decisions construing it are so ubiquitous in their role of defining the minimum baseline for effective assistance of counsel (see *Greer,* 79 Ill.2d at 121, 37 Ill.Dec. at 321–22, 402 N.E.2d at 211–12) that phrases such as "counsel's ineffectiveness" and "incompetence" (Pet. 24) are sufficient to assert "in terms so particular as to call to mind" that oft-invoked constitutional guaranty (*Sullivan,* 731 F.2d at 454). For cases discussing ineffective assistance of counsel claims without express reference to the Sixth Amendment or *Strickland,* see *Bobo v. Kolb,* 969 F.2d 391, 398–400 (7th Cir.1992) (discussing procedural default of claim in habeas proceeding) and *United States*

v. *Caban,* 962 F.2d 646, 648–50 (7th Cir.1992) (rejecting claim as grounds for new sentencing hearing).

12. It is not dispositive that the claim was asserted in a section of the petition with a heading that overtly raised another claim (*Pierson v. O'Leary,* 959 F.2d 1385, 1394 (7th Cir.1992)).

13. For a claim to be "fairly presented," it is sufficient that it be included in a substantive submission to a state court. It is not necessary that the court discuss or rule upon the claim in its opinion (*Wallace v. Duckworth,* 778 F.2d 1215, 1223 (7th Cir.1985)).

that the merits of the claim may be reached by this Court.

### Due Process and Equal Protection

█ Sumner's already-described final claim is that he was denied his right to due process and equal protection of law by the trial court's failure to determine whether trial counsel had neglected Sumner's defense due to counsel's ineffectiveness at trial. In that respect the Attorney General's Mem. 15 has urged a procedural default.

Before the Illinois Appellate Court, Sumner's Br. 36–39 fairly presented the factual basis for this claim: It is the same as that underlying the Sixth Amendment claim based on counsel's alleged conflict of interest at the post-trial hearing. In that respect the Attorney General has conceded Sumner raised the factual issue properly in the state courts. But as for the other aspect that is equally essential to the avoidance of procedural fault—the identification of a federal-Constitution-based legal theory—Sumner fails entirely. There is no way in which he may be viewed as having alerted the Illinois Appellate Court to an additional constitutional claim based on the same facts.

First of all, nowhere in his brief does Sumner use the terms "due process" or "equal protection." But even apart from that nonuse of the constitutional labels, none of the state cases that he cites (and he refers to no federal cases) discusses either due process or equal protection in even a remotely "like fact situation" as required under the second Sullivan factor.[14]

Consequently Sumner never fairly presented his due process and equal protection claim to the Illinois Appellate Court. Under Illinois law that failure also waives the later consideration of the claim by any state court (Precup, 73 Ill.2d at 16, 21 Ill.Dec. at 867, 382

N.E.2d at 231), so that there is no need to determine whether he fairly presented the claim to the Illinois Supreme Court.[15] Because Sumner has made no effort to show cause and prejudice for that failure, he has waived the claim for purposes of federal habeas review (Washington v. Lane, 840 F.2d 443, 445 (7th Cir.1988) (per curiam)).

### Merits of Surviving Claims

█ All three still-surviving claims of Sumner's constitutional deprivation are grounded on his Sixth Amendment right to counsel. That brings into play the familiar two-pronged approach established in Strickland, 466 U.S. at 687–94, 104 S.Ct. at 2064–68, under which Sumner must demonstrate both (1) deficient performance (a level of legal representation below an objective standard of reasonableness) and (2) prejudice (existence of a reasonable probability that the result of the proceedings would have been different but for his attorney's unprofessional representation). As for the first factor, "[j]udicial scrutiny of counsel's performance must be highly deferential" (id. at 689, 104 S.Ct. at 2065) and Sumner must overcome the "strong presumption" that viewed from the time of the proceedings his counsel's action "might be considered sound ... strategy" (id.). And as for the second, Lockhart v. Fretwell, —— U.S. ——, ——, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993) has more recently defined prejudice as the need to establish that the "counsel's deficient performance render[ed] the result ... unreliable or ... fundamentally unfair."

### Voluntary Manslaughter Instruction

█ Sumner argues that the evidence adduced at his trial would have supported a jury finding that he had killed Cranston in the unreasonable belief that his actions were

---

14. Only one case that Sumner cited to the Appellate Court discussed due process and equal protection: People v. Jameson, 155 Ill.App.3d 650, 660, 108 Ill.Dec. 106, 113, 508 N.E.2d 267, 274 (1987). And that case addressed those concepts in a completely different factual situation that was clearly inapplicable (even by analogy) to this case: whether defendant's constitutional rights were violated by a state rule that bars a court from ordering the victim of a sexual offense to submit to psychiatric or psychological examina-

tion. And even on that score the Appellate Court never reached the issue, because it had been waived in the trial court.

15. Where as here the Illinois Supreme Court denied leave to appeal, it cannot be viewed as having addressed the merits of such a non-previously-advanced constitutional claim, so as somehow to have waived Sumner's waiver.

necessary in self-defense.[16] If so, and if a voluntary manslaughter instruction had been offered, Sumner urges that he would have been convicted on the lesser included offense instead of murder. That omission is said to constitute the gravamen of the ineffective assistance claim—the theory being that counsel's failure to tender such an instruction limited the jury's deliberations to the alternative between (1) a murder conviction and (2) an acquittal based on Sumner's having created a reasonable doubt as to the higher and substantially more demanding legal standard (that is, was he justified in using the force that he did?).

During the trial Sumner argued that he acted in self-defense when stabbing Cranston, that he "was fighting for [his] life." At the close of the trial the jury was instructed that the State carried the burden of proving beyond a reasonable doubt that Sumner "was not justified in using the force which he used.[17] If the jury had found a reasonable doubt in that respect, they would have acquitted him of the crime of murder. Both from the nature of Sumner's testimony at trial and from the inclusion of the jury instruction on justification, it must be considered that Sumner's counsel operated on the rational premise that given the choice between guilty and not guilty on the murder charge, the jury could well find Sumner not guilty.

Can the omission of an intermediate voluntary manslaughter instruction also be viewed as a rational strategy—given the "strong presumption" supporting such a view? Sumner has offered nothing to negate the reasonableness of the idea that offering that alternative to the jury could actually have *increased* the prospects of his conviction—that if it had been given the added choice of finding Sumner guilty of voluntary manslaughter, the jury could have been more prone to take that route and less likely to acquit him.[18] While the either-acquittal-or-murder choice turned out to be a loser,

---

16. More accurately, given the burden of proof in a criminal case, the issue is instead whether the jury could have found that belief to have been proved beyond a reasonable doubt, and could thus have spurned the notion that the more serious crime of murder had been proved beyond a reasonable doubt.

17. Here was the jury instruction on the elements of murder (Tr. 441–42):

> A person commits the offense of murder when he kills an individual, without lawful justification, if, in performing the acts which cause the death, he knows that such acts create a strong probability of death or great bodily harm to that individual or another.
>
> To sustain the charge of murder, the State must prove the following propositions:
>
> First: That the defendant performed the acts which caused the death of Richard Cranston; and
>
> Second: That when the defendant, did so, he knew that his acts would cause a strong probability of death or great bodily harm to Richard Cranston.
>
> Third: That the defendant was not justified in using the force which he used.
>
> If you find from your consideration of all of the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.
>
> If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty.

That was followed by an instruction on the meaning of justification (Tr. 443–44):

> A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force.
>
> However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonable [sic] believes that such force is necessary to prevent imminent death or great bodily harm to himself.
>
> A person who initially provokes the use of force against himself is justified in the use of force only if the force used against him is so great that he reasonable [sic] believes he is in imminent danger of death or great bodily harm, and he has exhausted every reasonable means to escape the danger other than the use of force which is likely to cause death or great bodily harm to the other person.
>
> A person is not justified in the use of force if he initially provokes the use of force against himself with the intent to use the force as an excuse to inflict bodily harm upon the other person.

18. It is noteworthy that Sumner's trial counsel moved at the post-trial hearing for the entry of a judgment of guilty of manslaughter notwithstanding the jury verdict (Tr. 454). That is wholly consistent with the counsel's having been fully aware of the possibility of a voluntary manslaughter alternative but having decided to forgo it as trial strategy.

*Strickland* and its progeny teach that counsel's actions are not to be assessed with the benefit of hindsight. This Court cannot—under the required highly deferential analysis—find that such an approach fell below the level of constitutionally permissible legal representation, so that Sumner has not satisfied the first branch of the *Strickland* inquiry.

Sumner relies heavily on *Barnard*, 819 F.2d 798 in support of his contention that his own counsel's failure to tender an instruction on voluntary manslaughter constituted ineffective assistance. In that case Barnard had testified that he purposely shot the victim—a version similar in that respect to Sumner's testimony that he intentionally stabbed Cranston (*id.* at 802 n. 3). But there is a crucial distinction between the two cases:

1. In *Barnard* no instruction on justification was submitted to the jury at all. Instead the jury was told only that murder would be proved if Barnard had killed the victim and had either intended to kill or knew "that his act would or probably would cause death or great bodily harm" (*id.* at 803–04). Our Court of Appeals held that under the circumstances that left Barnard with "no defense at all," because based on Barnard's own testimony a jury following the instructions submitted to it had "no alternative but to find Barnard guilty" (*id.*).

2. By sharp contrast, in Sumner's case an express instruction on justification was given to the jury. Recognizing Sumner's justification defense, the prosecutor addressed the issue in considerable detail during his closing argument (Tr. 400–08). If the jury had believed Sumner, they would have had "no alternative but to find" him *not* guilty, clearly leaving Sumner with a defense (see *Kubat v. Thieret*, 867 F.2d 351, 365 n. 9 (7th Cir.1989) (failure to instruct on lesser included offense is not ineffective assistance where the defendant has an alibi defense unaffected by the failure).

Sumner ignores the differences between the instructions submitted to the jury in *Barnard* and those given in his own case. His R.Mem. 6–7 would have *Barnard* stand for the overly broad proposition that when a defendant charged with murder relies on self-defense as a justification, but the evidence against such a justification is strong, counsel's failure to submit an instruction on the next lesser included grade of homicide would per se constitute ineffective assistance of counsel. Only a moment's thought is needed to see that such a reading would create an incentive for any defendant in a murder prosecution who relies on a justification defense to forgo an instruction on the lesser included grade of homicide. If the strategy worked, defendant would be acquitted. And if the strategy failed, Sumner's proposed extension of *Barnard* would effectively guarantee defendant another trial based on ineffective assistance of counsel grounds—a trial at which the previously-omitted instruction would be submitted. Any such legal rule would allow federal habeas corpus proceedings to be used for precisely the kind of game-playing that federal courts have consistently endeavored to prevent. Section 2254 relief is not intended as a mechanism to allow defendants in state proceedings to get two bites at the merits of their case—its purpose is only to remedy violations of constitutional magnitude (see *Coleman*, —— U.S. at ——, 111 S.Ct. at 2554).

As the final proposed support for his argument that counsel was deficient, Sumner refers to *ABA Standard for Criminal Justice* 4-5.2, cmt. at 4-68 (1986). That comment states that a defendant "should" be the one to decide whether to seek submission of an instruction on a lesser included offense to the jury after consultation with his or her lawyer. Sumner urges that because counsel at the post-trial hearing did not say that the decision to omit the tender of a voluntary manslaughter instruction was made after consultation with Sumner, there is no evidence that his lawyer satisfied counsel's obligation. At least two reasons call for the rejection of that contention:

1. Sumner misapprehends the placement of the burden of proving counsel's deficient performance. It is not the lawyer's obligation to submit evidence that he or she was not deficient in his performance. Instead it is Sumner's burden to

come forward with evidence that rebuts the presumption that counsel's decisions were "sound trial strategy" (*Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065).

2. As already suggested, the *ABA Standards* do not lay down a per se rule—they rather state that defendant "should" (not "must") decide whether to tender a lesser-included-offense instruction. Counsel's possible nonadherence to what "should" be done according to the ABA[19] surely cannot establish that counsel's performance was *constitutionally* deficient—with or without the benefit of the "strong presumption" that counsel's conduct fell "within the wide range of reasonable professional assistance" (*Strickland, id.*)

Each claimed facet of Sumner's deficient-performance argument has thus failed. But even were it otherwise on this first part of the *Strickland* dichotomy, Sumner still cannot establish the second component: that the asserted deficiency "render[ed] the result" of his trial "unreliable or ... fundamentally unfair." Under Illinois law an individual commits voluntary manslaughter if at the time of a killing he believes that circumstances justify the killing but the belief is unreasonable (720 ILCS § 5/9–2(a)(2)). As the following discussion demonstrates, based on the facts adduced at trial there is every indication that Sumner could not have established that proposition, so that even with an instruction posing the voluntary manslaughter instruction the jury would have returned the same verdict: guilty of murder.

During the trial the State offered the testimony of four eyewitnesses who substantiated its version of events—that Sumner was the aggressor and that Cranston was not carry-

ing a knife or any other weapon when he fought with Sumner. Even Sumner's friend and companion that evening, Lewis (also a witness for the prosecution), testified that Sumner was already approaching the two-flat house with a knife in his hand when John Young told the Doberman pinscher to attack Sumner. Lewis was unable to testify that Cranston was carrying a knife (though he did not testify to the contrary either). Finally, the knife that Sumner claimed was used by Cranston was never recovered. In light of the overwhelming evidence supporting the conclusion that Sumner was the aggressor and that Cranston was unarmed, it is highly unlikely that a jury—merely on the uncorroborated testimony of Sumner—would have found that he unreasonably acted in self-defense when he fought with Cranston.

Just a word should be added on this opinion's use of the adjective "uncorroborated." This Court is mindful of Sumner's insistence that his lawyer should have called Barnes as a witness (presumably to support Sumner's version of the facts).[20] But what Barnes has set forth in her recent affidavit does not support the notion of a different verdict, even if a voluntary manslaughter instruction had been given.

First of all, Barnes does *not* say that Cranston was carrying a knife. Instead she states generally that Sumner was stabbed and beaten—a statement that is merely repetitive of evidence already adduced at trial and is explained by other facts of record. Next, Barnes' conclusory assertions that Sumner's actions were "completely defensive" and that he "was visibly in fear of losing his life" are not based on any evidentiary observations.[21] And in all events,

---

**19.** This opinion speaks of "possible" nonadherence because Sumner has not demonstrated that premise (the proposition just stated in the preceding text paragraph). But such proof will be assumed arguendo for purposes of *this* paragraph.

**20.** While no individual action or inaction by counsel may amount to constitutionally ineffective assistance, the aggregate effect of several such actions or inactions can so undermine the trial process that one can not have "confidence in the outcome" (*Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068; *Crisp v. Duckworth,* 743 F.2d 580, 583 (7th Cir.1984)). So although Sumner asserts

his counsel's failure to call Barnes as a witness as the factual basis of a separate Sixth Amendment violation, it will be discussed here to see if it meets that standard in combination with other factors.

**21.** To the extent that Barnes may have testified that Sumner tried to avoid his attackers by running around a car (Barnes Aff. ¶ 3), that would have been at odds with Sumner's own testimony that he was running toward the two-flat when Cranston came outside and proceeded to fight with Sumner (Tr. 355). Further, Sumner testified that he ran to his car only after the fight with Cranston had ended (Tr. 358).

Barnes' status as Sumner's former girlfriend would impart to her testimony less impact and credibility than that of a neutral witness. To be sure, the testimony of some of the witnesses for the State could similarly be viewed through the lens of their avowed closeness to Cranston.[22] But the controlling consideration overall is that Barnes' incremental testimony cannot qualify as rendering the result of the trial "unreliable or fundamentally unfair."

*Interviewing and Calling Witnesses*

■ This opinion has just examined Barnes' potential testimony and found it wanting in terms of the second *Strickland* factor. This Court now turns to the same subject from a somewhat different perspective: It will review Sumner's claim that his trial attorney's failure to interview Barnes and to call her at trial, after having said in his opening statement that she would testify, also independently constituted the ineffective assistance of counsel.

As for the first component of that claim— the failure to call Barnes as a trial witness— the just-completed analysis has established that Sumner can show no prejudice from that failure, regardless of whether or not a voluntary manslaughter instruction had been submitted. That conclusion effectively ends the matter on that score, for *Strickland* itself contemplates that ineffective assistance claims will often be disposed of based on a failure to show prejudice, without any need to analyze the competence of counsel (466 U.S. at 697, 104 S.Ct. at 2069).

What of the contention that Barnes' omission as a witness was exacerbated by Sumner's lawyer's having earlier informed the jury that they would hear from her, thus creating the negative inference that Barnes' testimony would not have supported Sumner's version of events? Based on the facts, that too cannot be said to constitute deficient performance. First, Sumner's counsel did not promise that Barnes would appear as a witness, but rather said that "hopefully" the jury would hear from her (Tr. 126). While the prosecutor's closing argument referred to her failure to appear (Tr. 436), Sumner's counsel minimized any potential of an adverse inference by arguing to the jury (albeit incorrectly as a matter of law[23]) that the State had the burden of calling Barnes to testify (Tr. 411–12, 416).[24] And importantly, the trial court properly instructed the jury that the lawyers' opening and closing statements are not evidence and that their arguments not supported by evidence should be disregarded (Tr. 439–40).

But once again, even if the performance of Sumner's counsel in that respect were to be perceived as deficient, Sumner still cannot show any resulting prejudice. As already stated, the State's evidence supporting Sumner's conviction was such that no prejudice flowed from the absence of Barnes' testimony as such. And any incremental effect of a possible negative inference that the jury may have drawn from Barnes' nonappearance is insufficient to have rendered Sumner's conviction "unreliable or fundamentally unfair," in light of all the evidence that supported the jury's finding of guilt (*United States v. Williams*, 934 F.2d 847, 851 (7th Cir.1991)).[25]

---

22. John Young said that he and Cranston "were like brothers" (Tr. 205), and Estelle Young was also very fond of Cranston (Tr. 158).

23. Cf. *People v. R.D.*, 155 Ill.2d 122, 141, 184 Ill.Dec. 389, 398, 613 N.E.2d 706, 715 (1993), holding that the State need not call all material witnesses at a suppression hearing. But the jury had no way to know that the argument was flawed in the legal sense.

24. Here is what Sumner's counsel said (Tr. 411–12, 416):

This is not my duty to bring in witnesses here. This is the State's obligation to prove the defendant guilty beyond all reasonable doubt and to present to you people all of the witnesses.

It isn't my duty and it's not my obligation. It is theirs and they utterly failed in it.

\* \* \* \* \* \*

Why didn't they even look for Diana [sic] [Barnes]. Wouldn't you have wanted to hear her version. All important witness and yet she is a phantom. We hear her name in this trial, but we never see her. We never hear from her. The State's burden is to bring in the witnesses when they are asking a jury in a murder or in any case to find a defendant guilty beyond a reasonable doubt.

25. Research has uncovered only one Seventh Circuit case, *Harris v. Reed*, 894 F.2d 871, 879 (7th Cir.1990), where counsel was found to have rendered ineffective assistance in part by failing

Finally and relatedly, because of the lack of prejudice to Sumner from the failure to call Barnes as a trial witness, Sumner similarly cannot show any prejudice from counsel's failure to interview her prior to trial (*Crisp,* 743 F.2d at 584–85). In sum, that claim also fails to pass muster as a ground for habeas relief.

*Post-trial Hearing*

■ Lastly, Sumner points to his counsel's failure to withdraw from the case at the post-trial hearing—a withdrawal that Sumner says should have been triggered by the alleged conflict of interest engendered by his counsel's inability to argue his own ineffectiveness at trial as grounds for a new trial. By definition that claim hinges on the predicate that Sumner's counsel was actually ineffective at trial: As just stated, Sumner contends that such ineffectiveness created a conflict of interest, which in turn tainted counsel's failure to withdraw at the post-trial hearing. But because the analysis to this point has shown that the premise—counsel's ineffectiveness at trial—is flawed, the argued-for conclusion falls as well.

To restate the issue in another way, the only prejudice that Sumner can assert is that his motion for a new trial was denied, while a lawyer who was not laboring under the conflict of arguing his own incompetence would have succeeded. But Sumner also had appellate counsel who pursued that claim with obvious zeal, and the Illinois Appellate Court independently addressed the merits of both the claim and the claims of ineffective assistance at trial—and it found all of them to be wanting. This Court has just addressed the same claims and has also found them to be without merit. Thus as a matter of both Illinois and federal law Sumner has not established that his trial counsel was ineffective—surely the trial court's denial of Sumner's motion for a new trial did not prejudice Sumner in the terms of being a result that is "unreliable or fundamentally unfair," for the motion would have been denied regardless of who argued it.

As his final contention in this area, Sumner contends that when any lawyer argues his ineffectiveness at trial as grounds for a new trial at a post-trial hearing, he faces a type of conflict of interest with respect to which lawyer's ineffectiveness can be presumed. While ineffective assistance has indeed been found where counsel actually represents conflicting interests at trial so as to affect his performance materially (*Cuyler v. Sullivan,* 446 U.S. 335, 348–49, 100 S.Ct. 1708, 1718–19, 64 L.Ed.2d 333 (1980)), our Court of Appeals has specifically declined to extend the *Cuyler* presumption of prejudice to the defendant to the precise type of claim that Sumner is asserting here (*Johnston v. Mizell,* 912 F.2d 172, 177 (7th Cir.1990)). To obtain relief Sumner must satisfy the *Strickland* standards, and he has not.

*Conclusion*

No evidentiary hearing of Sumner's petition was requested or is needed here. This Court has culled the record and rulings of the state courts, as well as the affidavit of Diane Barnes submitted by Sumner. Based on that review:

1. Sumner's first and third claims are rejected in their entirety on the merits.

2. Sumner's second claim (a) is waived as to Newsome due to procedural default and (b) is rejected on its merits with regard to Barnes.

3. Sumner's fourth claim has been waived in its entirety due to procedural default.

to call a witness referred to during opening statement. But in *Harris* the defense counsel had failed to present any evidence at all in support of the defense, a situation materially different from the present case, where Sumner testified at some length on his own behalf (Tr. 346–96). As for the First Circuit's *Anderson* case that Sumner relied on his brief to the Illinois Appellate Court, it too is meaningfully distinguishable from Sumner's case. In *Anderson* the defense counsel, despite a promise made in opening statement, failed to call expert witnesses who would have offered the type of credible support for a psychological defense that no lay person could offer (858 F.2d at 17). As already stated, Barnes' testimony is not at all of that type: It would not only have been cumulative in nature, but most importantly it really did not support Sumner's claim that Cranston had a knife.

Accordingly the Petition is denied in its entirety, and this action is dismissed.